IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN T. HUFF FAMILY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No._____ |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| THE MONARCH CEMENT COMPANY and | ) | |
| CITY WIDE CONSTRUCTION | ) | |
| PRODUCTS CO., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Steven T. Huff Family, LLC, ("**Plaintiff**" or "**Pensmore**"), by and through its counsel, files this Complaint against The Monarch Cement Company ("**Monarch**") and City Wide Construction Products Co. ("**City Wide**"), collectively ("**Defendants**"), and alleges as follows:

## NATURE OF THE CASE

1. Steven T. Huff Family, LLC, owner of Pensmore, a 72,000 square foot structure in Highlandville, Missouri, files this action to hold liable Monarch and City Wide for their deliberate misconduct, admitted by a whistleblower and separately confirmed by scientific testing, in defendants' construction of Pensmore. Steven T. Huff ("Huff") dedicated years of his life to executing his Pensmore strategy, studying the most innovative construction and green energy technologies and investing in the companies that developed them. Pensmore was to be

the model, designed to change the very nature of safety and energy standards in constructing schools, hospitals and homes.

2.      Using approximately 200,000 pounds of state-of-the-art reinforced steel, called Helix™, mixed with thousands of yards of concrete and plasticizer, Pensmore is designed to absorb the strength of the F5 tornado that devastated nearby Joplin, Missouri, in 2011, or even a bomb blast.  In addition, Pensmore's walls are constructed with a newly developed heating and cooling system that "banks" excess solar energy on sunny days, time-releasing the heat on cooler and cloudy days.  Even at 72,000 square feet, it should cost little to heat and cool Pensmore.

3.      As promoted on the *Today Show* in September 2011, Pensmore, properly built, was to be disaster-resistant, green and self-sustaining.  All things being equal, Pensmore stood to be perhaps the safest and greenest structure in the world.  All things, however, were not equal.

4.      From October 28, 2009 through November 20, 2012, defendants "shorted" the amount of Helix™ that they agreed to use in constructing Pensmore.  On most days that the Helix™ was mixed with concrete at defendants' facilities, they deliberately failed to use countless boxes of Helix™.  Instead, defendants put enormous quantities of Helix™, paid for by Plaintiff and dedicated for use at Pensmore, on their trucks and drove them to a storage area, hidden from Pensmore's representatives.  Separately, the amount of plasticizer, an additive to strengthen the walls and maximize the effectiveness of Helix™, was watered down by defendants, or not used at all.

5.      In October 2014, a whistleblower with firsthand knowledge of defendants' fraud waited outside of the Pensmore compound gates until a Pensmore representative agreed to speak with him.  The whistleblower's account, revealed for the first time to Pensmore in October 2014,

2

exposed defendants' scam in explicit detail. Based on the facts provided by the whistleblower, including the amount of Helix™ that should have been used per pour at Pensmore but was not, defendants shorted Pensmore approximately 72,000 actual pounds of Helix™, likely secretly reselling it. The whistleblower was challenged and tested through harsh questioning. Put simply, Pensmore did not want to believe him.

6.     Yet, the whistleblower carefully parsed what he knew, what he believed and what he did not know only adding to his credibility. He has never asked Pensmore for money or anything else. He came forward, he said, because he tried to stop defendants at the time, but failed. For two-plus years, he lost sleep over Pensmore because he still felt "lousy" about what occurred. Where he only should have felt pride in what he was constructing, he said, he felt only shame.

7.     Still, Pensmore did not take the whistleblower's word for it, alone. Pensmore began performing "core testing" to determine whether the amount of Helix™ in the walls was proper. In consultation with the man who invented Helix™, the fiber counts from core tests confirmed the whistleblower's account. Months of additional scientific testing confirms the shorting of Helix™ by defendants at Pensmore.

8.     Ultimately, what was actually built by defendants was not constructed to Pensmore's disaster-resistant specifications and was not what Pensmore bargained for or publicly promoted. A business vision with altruistic aims has been hijacked by defendants' deliberate misconduct. Now, Pensmore asserts claims for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with business expectancy and other related causes of action. Pensmore will seek damages in an amount of not less than

3

$63,000,000.00. Pensmore will also ask the jury for exemplary damages in an amount sufficient to punish defendants for their willful misconduct and to deter defendants from ever defrauding any other person again.

## PARTIES

9.      Plaintiff Steven T. Huff Family, LLC is a Virginia company, with its principal place of business located at 9302 Lee Highway, Suite 1100 Fairfax, Virginia, 22031. Plaintiff's members are not Missouri residents.

10.      Monarch is a Kansas corporation with its principal place of business at 449 1200 Street, Humboldt, Kansas, 66748-0900.

11.      City Wide, a/k/a as City Wide Ready Mix and City Wide Concrete, is a subsidiary of Monarch, with its principal places of business at 1948 NW Bypass, Springfield, Missouri, 65803, and 1817 North Farmers Branch Road, Ozark, Missouri, 65721.

## JURISDICTION AND VENUE

12.      Jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.      Venue is proper in the United States District Court for the Western District of Missouri Southern Division under 29 U.S.C. § 1132(e)(2) because a substantial part of the events giving rise to plaintiff's claims arose in this judicial district.

## CITY WIDE IS MONARCH'S ALTER EGO

14.      Upon information and belief: (1) Monarch and City Wide fail to observe corporate formalities and are treated as one entity; (2) at all relevant times Monarch has

4

SPH-2135740-3

dominated and controlled the operations of City Wide, treating it as a division, rather than as an independent corporate entity; (3) Monarch and City Wide market their products and services under one common business; and (4) Monarch and City Wide file consolidated tax returns.

15.     In fact, Monarch promotes its business as follows: "We don't stop at just making the highest quality cement. The Monarch family of companies extends into the realm of ready-mixed concrete, concrete products, and sundry building materials. Each of these companies has the same dedication to quality and craftsmanship that the Monarch name has represented for nearly a century." City Wide is the alter ego and/or agent of Monarch such that the separate personalities of the corporations do not really exist, and plaintiff would be inequitably harmed if City Wide's acts were treated separately and independently of Monarch.

16.     The whistleblower received his paycheck from Monarch – not City Wide.

## FACTS

### The Pensmore Chateaux

17.     Pensmore is a 72,000 square foot structure in Highlandville, Missouri. It is designed to withstand a F5 tornado, an earthquake and even a bomb blast. It uses the most innovative construction methods available to reinforce building structures and the most advanced geothermal and other green technologies to reduce energy costs. Specifically, Pensmore is designed with: (1) Helix™, a new reinforced steel product; (2) TransForm™, a proprietary lightweight, super-insulated and energy-storing concrete forming system; (3) solar thermal heat collectors; (4) radiant heating and cooling; (5) advanced climate control software; (6) and harvested rainwater.

5

18.     The key to Pensmore's exceptional structural integrity design is the Helix™ reinforced steel fiber.  Helix™ was conceived to be an alternative to Rebar, the prior leading reinforced steel product on the market in blast resistant applications.  What makes Helix™ - mixed concrete unique is that it leverages frictional resistance, bending with the force of stress because of its distinctive twisted shape and strengthening the concrete matrix in all directions.  Conversely, Rebar and ordinary steel begin to fail as friction is created and the concrete becomes stressed.  What eventually became Helix™ was invented in a University of Michigan research and development laboratory for the U.S. Army Corp of Engineers.  Today, Helix™ is sold and used for a wide array of applications, including commercial structures, roads, bridges, homes and airports.

19.     The cement at Pensmore was meant to include an exceptionally large amount of Helix™ – over 200,000 pounds of it.

**The Polytorx-Pensmore and TF Forming Partnerships**

20.     The opportunity to change the way structures are designed to make them safer, more sustainable and green, especially in geographic areas susceptible to extreme weather, is, from Huff's perspective, limitless.  It is for this reason that Huff developed Pensmore's overall business strategy, to use its completed structure as a launch pad for his vision to change the construction business.

21.     In January 2009, Huff invested in TF Forming Systems, which owns the rights to the TransForm™ insulated concrete form.  In August 2011, Huff invested in Polytorx, which owns Helix™ steel.

SPH-2135740-3

**Monarch and City Wide Are Chosen as the Supplier**

22.     Concrete must be poured within a limited period of time after it is mixed, before it begins to "set" or harden.  It is for this reason, and because plaintiff wanted to help boost the local economy, that it wanted any concrete supplier hired to mix and deliver the concrete close to Highlandville.

23.     While Pensmore solicited bids from a few vendors, it was intent on selecting a well-established, larger company.  Monarch and City Wide were the most obvious choice to win Pensmore's business.  Pensmore derived great comfort from the fact that Monarch is a public company, with 510 employees and thirteen subsidiaries. [1]  Monarch has recently deregistered from the Securities Exchange Commission and taken itself private.  Publicly, Monarch asserts that it did so to avoid onerous regulations.

24.     Monarch has two lines of businesses:  ready-mixed concrete and cement.[2] Its operations and sales are focused in Kansas, Iowa, Nebraska, Northwest Arkansas, Northern Oklahoma and Western Missouri.  City Wide, a Monarch subsidiary located in Springfield and Ozark, Missouri, just miles from Highlandville, sells concrete products and sundry building materials.  It also mixes concrete.

25.     While there are purchase orders, e-mails and invoices evidencing that Monarch and City Wide won the Pensmore business, the agreement was made principally on a handshake.  Winning the Pensmore business was so critical to Monarch that its President and Chairman, Walter H. Wulf, Jr., visited Pensmore as defendants were building it.

---

[1] Monarch's total assets as of September 30, 2014 were $182.4 million.

[2] In 2013, Monarch's cement business accounted for 43.8% of its total sales.  The remaining 56.2% of total sales was from their ready-mixed concrete business.  Monarch's public filings only show consolidated reporting of its and its subsidiaries financial performance.

7

SPH-2135740-3

26.     Defendants' last pour of the Helix™-mixed concrete on the Pensmore structure was in November 2012.

**The Agreed Upon Helix™-to-Concrete Ratio**

27.     One of the biggest challenges in mixing Helix™ with cement is avoiding clumping, or what is commonly called "hairballs," from forming in the cement mixture. Helix™ must be mixed as evenly as possible as the concrete is poured, and remain that way as it hardens, to minimize the hairball problem.

28.     Prior to the first Helix™-mixed concrete pour at Pensmore, the City Wide Plant Manager at the time, Don Shuler, asked one of his mechanics if he could work on reducing, or eliminating, the Helix™ "hairball" problem, while maximizing the amount of Helix™ required. City Wide's mechanic experimented with what is called an air-powered shaker, a tool used to vibrate the mixture with so much power that it spreads the Helix™, as evenly as possible, as it is fed into the cement mixer truck. After about one week, defendants claimed that they could minimize the hairballs in the Helix™-mixed concrete.

29.     Prior to each pour, City Wide and Pensmore agreed on the amount of Helix to be mixed in the cement. Generally, four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours. Mid-size pours required 6 boxes of Helix™ per eight-yard truck. The highest dosage pours for the most robust parts of the house were to be eight boxes per eight-yard truck or ten boxes per 8-yard truck. Before each pour, City Wide confirmed the Helix™-to-concrete ratio with Pensmore's representatives, and numerous people at City Wide, including Mr. Shuler.

8

SPH-2135740-3

30.     Based on the Helix™-to-concrete ratio, Pensmore bought the required amount of Helix™ to build the entire Pensmore structure, over 200,000 pounds of it.  Purchase orders confirm that Pensmore ordered, paid for and had delivered to City Wide's office, the 4,680 boxes of Helix™ needed to build Pensmore and accomplish what Pensmore wanted.

31.     Defendants stored pallets of Pensmore's Helix™ at the City Wide offices.  For each concrete delivery to Pensmore, defendants mixed the Helix™ with concrete at City Wide's offices and drove it to Pensmore.  Dave Calhoun, City Wide Chief Executive Officer, oversaw the loading of the Pensmore Helix™ pallets into the trucks for mixing.

**The Helix™ Mix at Pensmore is Not What It Should Be**

32.     Yet, from the first mixture of Helix™ into the concrete for Pensmore, defendants deliberately shorted Pensmore on the Helix™ that was used.  City Wide employees were ordered to use two boxes of Helix™ instead of four for every eight yards-mixed, or four boxes of Helix™ instead of six, six boxes of Helix™ instead of eight, and eight boxes of Helix™ instead of ten.  Certain City Wide employees objected to the practice, but it was made clear by defendants that if the employees did not do what they were told, they would lose their jobs.

33.     At the beginning of any given day, defendants would have a sufficient number of boxes of Helix™ in Pensmore's storage area at their offices.  During the day, if City Wide mixed an eight-yard truck of concrete, and it used two boxes of Helix™ instead of four, the extra two boxes of Helix™ were hidden from Pensmore representatives, loaded onto City Wide trucks and moved to the City Wide offices.  If at the end of the day, a Pensmore representative showed up at City Wide to count the number of boxes of Helix™ used, as occurred from time to time, the number of boxes appeared to be correct.  Knowing that a representative from Pensmore might

9

SPH-2135740-3

arrive to determine if more Helix™ needed to be ordered, defendants hid the excess boxes, moving them from Pensmore's normal storage areas. On information and belief, the excess boxes of Helix™ were resold by City Wide.

34. On October 7, 2009, for example, Pensmore ordered 7 pallets or 11,340 pounds of Helix™ to defendants' Springfield, Missouri facility; and 19 pallets, or 30,780 pounds of Helix™ to defendants' Ozark, Missouri office. On October 28, 2009, defendants poured the first basement walls, shorting Pensmore by over 3,000 pounds of Helix. The chart below estimates the amount of Helix™ that defendants shorted Pensmore over three years:

| Date | Description | Agreed upon Total Helix per pound to be mixed | Amount of Helix "shorted" by Defendants |
|------|-------------|-----------------------------------------------|------------------------------------------|
| October 2009 to March 2010 | Basement Walls | 23,985 Helix™ lbs., agreed. | 11,993 Helix™ lbs., shorted. |
| March 2010 to May 2010 | First Level Floors | 14,259 Helix™ lbs., agreed. | 9,506 Helix™ lbs., shorted. |
| July 2010 to January 2011 | Second Level Floors | 12,656 Helix™ lbs., agreed | 8,438 Helix™ lbs., shorted. |
| June 2010 to January 2011 | First Level and Utility Walls | 27,000 Helix™ lbs., agreed. | 13,781 Helix™ lbs., shorted. |
| December 2010 to June 2011 | Second Level Walls | 24,998 Helix™ lbs., agreed. | 12,499 Helix™ lbs., shorted. |
| May 2011 to December 2011 | Attic & Other Walls | 18,689 Helix™ lbs., agreed. | 9,889 Helix™ lbs., shorted. |

10

| Date | Description | Agreed upon Total Helix per pound to be mixed | Amount of Helix "shorted" by Defendants |
|---|---|---|---|
| March 2011 to November 2012 | Attic Floors | 69,008 Helix™ lbs., agreed. | 51,508 Helix™ lbs., shorted. |

35.     In all, from October 2009 through November 2012, defendants shorted Pensmore roughly 72,000 actual pounds of Helix™ in the construction of Pensmore.

36.     Numerous people at City Wide knew about what was being done with Pensmore's Helix™, from truck drivers who drove the Helix™ from City Wide to Pensmore, to those who mixed the Helix™ and concrete, to those responsible for keeping inventory.

37.     From October 2009 through November 2012, as the construction work was performed by defendants on Pensmore, the Helix™ mixture poured into the concrete was not what it was supposed to be and not the amount for which Pensmore had bargained.

**The Plasticizer Is Watered Down and Left Out by City Wide**

38.     At the same time that defendants were not mixing the right amount of Helix™ into the concrete, City Wide employees were directed not to use the proper amount of Plasticizer to support the concrete. If 5 gallons of Plasticizer were required, defendants mixed 2.5 gallons of plasticizer and 2.5 gallons of water, making it appear as though 5 gallons of Plasticizer were actually used. On some occasions, no plasticizer was added at all.

39.     Adding Plasticizer to cement keeps the consistency of the cement, making it much stronger. Watering down Plasticizer weakens the concrete and can cause more Helix™ hairballs.

SPH-2135740-3

**A Whistleblower Confirms the Fraud**

40.     In October of 2014, a witness with firsthand knowledge of defendants' scam waited at the front of Pensmore's gates, doggedly asking to speak to a Pensmore representative. When a Pensmore representative agreed to speak with him, the witness disclosed, in explicit detail, defendants' scam.

41.     In particular, the whistleblower confirmed that Pensmore and defendants agreed that four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours. Mid-sized pours required six boxes of Helix™ per eight-yard truck. The highest dosage pours required eight boxes per eight-yard truck and some required ten boxes per eight-yard truck. The whistleblower confirmed that prior to each pour, defendants understood the exact number of boxes to be used, per eight-yard pour.

42.     He further disclosed that if City Wide mixed an eight-yard truck of concrete and four boxes of Helix™ were required to be used, defendants used two boxes. If six boxes of Helix™ were required, he asserted, four were actually used, if eight boxes were required, six were actually used and if ten boxes were called for, eight were used. The whistleblower confirmed that the excess boxes of Helix™ were hidden from Pensmore representatives, loaded onto City Wide trucks, returned to the City Wide offices and stored separately.

43.     In the hopes that the witness was mistaken, Pensmore representatives tested and challenged the witness, under difficult questioning. The questioning only added to the whistleblower's credibility. He described how he tried to stop the scam, but defendants threatened his job. Concerned about how he would feed his family, he continued to participate in it, until, as he described it, his conscience would not allow it. While his job was again

12

SPH-2135740-3

threatened, he began disobeying defendants' orders to reduce the amount of Helix™ that was mixed into the cement at Pensmore. Defendants reduced his hours. Yet, he refused to quit and was ultimately fired.

44.     The whistleblower became emotional describing how the Helix™ twisted metal was sharp. Often, he would end the day with minor cuts on he hands. He did not care. He was very proud to be part of building Pensmore. Now, he said, he felt only shame. The whistleblower, for his part, has never asked for anything in return for disclosing the facts to Pensmore.

### Core Testing Confirms the Whistleblower's Assertions

45.     Plaintiff did not take the whistleblower's word for it, alone. Pensmore paid to have various core samples of the walls and floors scientifically tested by a company of expert Registered Professional Engineers. On March 27, 2015, following rigorous testing to determine the amount of Helix™ present in the core samples, the engineers issued a formal report to Pensmore confirming that the amount of Helix™ used at Pensmore was not what it was required to be. On April 14, 2015, the same Registered Professional Engineer revised the formal report to include additional specimens tested from the Pensmore structure. The test results again confirmed the whistleblower's account of the shorting of the Helix™ by defendants.

### Defendants' Ethics Policy

46.     The stated purpose of Monarch's "Ethics Policy" is "to establish a culture of openness, trust and integrity in business practices." The Ethics Policy reads:

> Monarch is committed to protecting employees, partners, vendors and the company from illegal or damaging actions by individuals, either knowingly or unknowingly. Monarch will not tolerate any wrongdoing

13

or impropriety at anytime.  Monarch will take the appropriate measures
and act quickly in correcting the issue if the ethical code is broken.

47.     Plaintiff files this action to test defendants' commitment to its own Ethics Policy
and to expose defendants' behavior in the hope that defendants never defraud another customer
again.[3]  Everything plaintiff had dedicated itself to achieve is compromised by defendants'
actions.

## COUNT I
## (Fraud)

48.     Plaintiff repeats and realleges the allegations contained in the paragraphs above
as if fully set forth here.

49.     From October 7, 2009 through November 20, 2012, defendants made a series of
false and misleading statements and omissions of material fact to representatives of Pensmore to
induce plaintiff to pay defendants to construct Pensmore.  These misstatements and omissions
include:

  a.  The amount of Helix™ to be used for each pour was identified and agreed by the
      parties, including the Whistleblower and Don Shuler for defendants and duly
      authorized Pensmore representatives, *before* each and every pour.  Prior to the
      **Basement Wall pours** on October 28, 2009, December 22, 2009, January 19,
      2010, March 5, 2010, March 6, 2010 and March 17, 2010; **First Level Floor
      pours** on March 29, 2010, April 8, 2010, April 9, 2010, April 12, 2010, April 14,

[3] In an attempt to resolve the matter, the parties entered into a Standstill and Tolling Agreement, effective on March 3, 2015, delaying the filing of this suit while preserving the parties' rights.  The Standstill and Tolling Agreement was extended three times, but ultimately the parties did not resolve this matter.

14

2010, April 19, 2010, April 20, 2010, April 26, 2010, April 27, 2010, April 28, 2010 and May 4, 2010; **Second Level Floor pours** on July 21, 2010, July 23, 2010, October 5, 2010, October 7, 2010, November 3, 2010, November 15, 2010, November 19, 2010, December 3, 2010 and January 29, 2011; **First Level and Tunnel Wall pours** on June 23, 2010, July 27, 2010, August 17, 2010, September 15, 2010, September 17, 2010 (two pours), October 26, 2010, October 27, 2010 and November 2, 2010; **Second Level Wall pours** on December 9, 2010, January 27, 2011, March 10, 2011, April 13, 2011, April 28, 2011 and June 15, 2011; **Attic and various other Wall pours** on May 18, 2011, August 11, 2011, August 26, 2011, September 21, 2011, October 13, 2011 (two pours that day), November 17, 2011, December 8, 2011 and December 21, 2011; and **Attic Floor pours** on March 29, 2011, April 6, 2011, April 13, 2011, June 10, 2011, June 14, 2011, June 15, 2011, June 20, 2011, June 27, 2011, July 1, 2011, August 2, 2011, October 25, 2011, December 30, 2011, January 23, 2012 (two pours) February 1, 2012, February 20, 2012, March 1, 2012, March 26, 2012 (two pours) May 21, 2012, June 30, 2012, August 24, 2012, November 1, 2012 and November 20, 2012 -- defendants affirmatively represented that four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours, six boxes of Helix™ per eight-yard truck for mid-sized pours, eight boxes per eight-yard truck and ten boxes per eight-yard truck for higher dosage pours.

b. From October 28, 2009 through November 20, 2012, defendants assured Pensmore that the appropriate boxes of Helix™ were being used for each pour,

15

concealing from Pensmore that two boxes of Helix™ instead of four for every eight yards-mixed, four boxes of Helix™ instead of six, six boxes of Helix™ instead of eight, and eight boxes of Helix™ instead of ten boxes of Helix™.

c.  From October 28, 2009 through November 20, 2012, defendants concealed that the boxes of Helix™ not used were loaded onto defendants' trucks, driven back to defendants' facilities and hidden from Pensmore.

d.  From October 28, 2009 through November 20, 2012, defendants misrepresented that they were using the appropriate amount of Plasticizer, concealing that defendants watered down the Plasticizer, and often failed to include any Plasticizer at all.

50.     Defendants knew that the false and misleading statements and omissions were false at the time they were made.  Defendants made these false representations to give the appearance that the proper amounts of Helix™ and Plasticizer were being used, concealing that they were shorting the proper amount of Helix™ actually used and watering down the plasticizer, or not using it at all.  Defendants continued to be paid by Pensmore for mixing, pouring and laying 200,000 pounds of Helix™ with concrete, secretly hiding from Pensmore countless boxes of Helix™ which, on information and belief, were resold by defendants.

51.     Defendants made these false representations with the intention that plaintiff would rely on them and continue to pay defendants to construct Pensmore.  Plaintiff justifiably relied on defendants' false statements and omissions by, among other things:  (1) buying over 200,000 pounds of Helix™ to be used to build Pensmore based on the parties' understanding of the amounts required per pour, on October 7, 2009, February 1, 2010, December 1, 2010,

16

October 31, 2011, November 6, 2011 and May 8, 2012; (2) delivering the Helix™ to defendants' facilities; (3) paying, in full, for defendants to build Pensmore; and (4) promoting publicly, including on the *Today Show*, that Pensmore could withstand a F5 tornado and a bomb blast.

52.     Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above.  As a direct and proximate result of defendants' fraud, plaintiff suffered, and continues to suffer, injury and damage in an amount to be determined at trial.

53.     Plaintiff is entitled to exemplary damages for defendants' intentional, willful misconduct.

## COUNT II
### (Breach of Contract)

54.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

55.     Plaintiff, on the one hand, and Monarch and City Wide on the other, entered into a binding implied in fact or oral contract, from October 2009 through November 2012, to build the Pensmore complex.  Defendants were to provide the ready-to-mix concrete and construct the concrete walls according to Pensmore's specifications, and Pensmore was to provide the Helix$^{TM}$ and pay defendants for the construction.  Specifically, defendants, through Don Shuler, the whistleblower and others, and Pensmore, through its representatives agreed: four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours. Mid-sized pours required six boxes of Helix™ per eight-yard truck.  The highest dosage pours required eight boxes per eight-yard truck and some required ten boxes per eight-yard truck.  Plaintiff and

17

defendants agreed to the exact number of boxes to be used, per eight-yard pour, depending on which portion of the structure was being built – prior to each pour.

56.     Plaintiff performed its contractual obligations by ordering over 200,000 pounds of Helix™, paying for the Helix™ in full, and having it delivered to defendants' offices, as well as making payments to City Wide for the ongoing construction of Pensmore.  From October 7, 2009 through November 20, 2012, Monarch and City Wide breached their contractual obligations to plaintiff by shorting the amount of Helix™ used in virtually every concrete pour in the construction of Pensmore.  Defendants used two boxes of Helix™ instead of four for every 8 yards-mixed, or four boxes of Helix™ instead of six, six boxes of Helix™ instead of eight, and eight boxes of Helix™ instead of ten.  The excess, unused boxes of Helix™ were returned to defendants' offices and hidden from plaintiff and its representatives.

57.     Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above.  As a direct and proximate result of defendants' breach, Plaintiff suffered, and continues to suffer, injury and damage in an amount to be determined at trial.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

58.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

59.     Inherent in every contract in the State of Missouri is an implied covenant of good faith and fair dealing.  The covenant includes the assurance that a party to the contract will not

SPH-2135740-3

take measures to undermine the other contracting party's ability to appreciate the benefits of the contract.

60. As stated above, plaintiff and defendants had a valid and enforceable implied in fact and/or oral contract. Defendants, by deliberately "shorting" the amount of Helix™ and Plasticizer used to construct Pensmore, attempted to deprive Pensmore of the benefits of the implied in fact agreement.

61. Defendants' bad faith and malicious misconduct in deliberately shorting the amount of Helix™ and Plasticizer used to construct Pensmore, constitutes a violation of the implied covenant of good faith and fair dealing contained in the implied in fact and/or oral contract.

62. Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above. As a direct and proximate result of defendants' failure to engage in good faith and fair dealing in the execution of implied in fact agreement, plaintiff suffered and continues to suffer, injury and damage in an amount to be determined at trial.

63. Plaintiff is entitled to exemplary damages for defendants' knowing, willful breach of the covenants of good faith and fair dealing.

## COUNT IV
### (Promissory Estoppel in the Alternative)

64. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

SPH-2135740-3

65.     Defendants promised plaintiff that: four boxes of Helix™ were used per eight-yard concrete truck for the lowest dosage pours.  Mid-sized pours required six boxes of Helix™ per eight-yard truck.  The highest dosage pours required eight boxes per eight-yard truck and some required ten boxes per eight-yard truck.  Plaintiff and defendants agreed to the exact number of boxes to be used, per eight-yard truck, depending on which portion of the structure was being built – prior to each pour.  Defendants promised to use the amount of Helix™ agreed upon per pour.  Defendants made its promises with the expectation that Pensmore would materially change its position in reliance on its promises.

66.     Plaintiff justifiably relied on defendants' false statements and omissions by, among other things:  (1) buying over 200,000 pounds of Helix™ to be used to build Pensmore based on the parties' understanding of the amounts required per pour, on October 7, 2009, February 1, 2010, December 1, 2010, October 31, 2011, November 6, 2011 and May 8, 2012; (2) delivering the Helix™ to defendants' facilities; (3) paying, in full, for defendants to build Pensmore; and (4) promoting publicly, including on the *Today Show*, that Pensmore could withstand a F5 tornado and a bomb blast.

67.     Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above. As a result of defendants' promises, plaintiff suffered definite and substantial reliance damages in an amount to be proven at trial.

SPH-2135740-3

## COUNT V
### (Tortious Interference with Business Expectancy)

68. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

69. At all times relevant to this action, defendants were aware of plaintiff's partnerships with Polytorx and TF Forming. Prior to pouring the first batch of concrete and continuing through the last pour in November 2012, defendants knew that Pensmore, finally constructed, would serve as the launch pad for the Polytorx-Helix™ Steel and TF-Forming-TransForm™ businesses. Defendants knew that these businesses were likely and legitimately expected to produce future economic benefits to plaintiff, if Pensmore was properly built by defendants.

70. Defendants intentionally interfered with plaintiff's economic and prospective economic advantage with the Polytorx-Helix™ Steel and TF-Forming-TransForm™ through dishonest and improper means. Most significantly, as a direct result of the fraudulent misstatements and omissions detailed above, defendants wrongfully lured plaintiff into its scam to short Helix™ and Plasticizer, hindering plaintiff's ability to use the finally constructed structure as the launch pad for the Pensmore-Polytorx and Pensmore-TF Forming partnerships.

71. Defendants acted with without any business justification, with malice, and with the intention to harm plaintiff financially and to interfere with their economic advantage in the reinforced steel and construction industries.

72. Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above. As a direct and proximate

21

result of defendants' tortious interference, Plaintiff suffered, and continues to suffer, injury and damage in an amount to be determined at trial.

73.     Plaintiff is entitled to exemplary damages for defendants' tortious interference.

## COUNT VI
### (Conversion)

74.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

75.     From October 28, 2009 through November 20, 2012, defendants shorted the amount of Helix™ to be used in the construction of Pensmore, hiding numerous boxes of Pensmore's Helix™ from Pensmore.  Plaintiff first became aware of defendants' scheme when a whistleblower disclosed it to Pensmore in October 2014.

76.     On multiple occasions plaintiff inspected the Pensmore Helix™ storage facility at defendants' offices.  Defendants made it appear as though the proper amount of Helix™ was being used to construct Pensmore, hiding numerous boxes of Pensmore's Helix™ in a separate location.

77.     By unjustifiably hiding boxes of Pensmore's Helix™, and, on information and belief, reselling it, defendants have improperly converted Pensmore's property.

78.     Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above.  As a direct and proximate result, plaintiff suffered (and continue to suffer) injury and damage in an amount to be determined at trial.

SPH-2135740-3

## COUNT VII
### (Unjust Enrichment)

79.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

80.     Defendants were unjustly enriched by continuing to accept payment from Pensmore, while failing to construct Pensmore as agreed, simultaneously removing boxes of Helix™ required to be used to construct Pensmore, and, on information and belief, reselling the unused boxes. For each box of unused boxes of Helix™ resold by defendants they were unjustly enriched in twice: Defendants were paid by Pensmore to mix the full amount of Helix™ as agreed, while, on information and belief, also accepting payment from third-parties in reselling Pensmore's unused boxes of Helix™.

81.     It would be inequitable to allow defendants to retain the benefits of their misconduct without payment to plaintiff of the value received by defendants. Defendants should be required to disgorge to plaintiff all sums paid by plaintiff to defendants to date, or otherwise to compensate plaintiff fairly, in order to avoid defendants being unjust enriched by their misconduct.

82.     Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above. As a direct and proximate result, plaintiff suffered (and continue to suffer) injury and damage in an amount to be determined at trial.

SPH-2135740-3

## COUNT VIII
### (Negligent Retention)

83.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

84.    On information and belief, Monarch and City-Wide had knowledge of previous misconduct by Don Shuler, Manager at City-Wide and a Monarch employee, and knew or should have known that keeping Shuler employed, Shuler would create an unreasonable risk of harm that would result in plaintiff's injury.

85.    Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above.  As a direct and proximate result of defendants' negligence, plaintiff suffered (and continues to suffer) injury and damage in an amount to be determined at trial.

## COUNT IX
### (Negligent Supervision)

86.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth here.

87.    Defendants had a duty to supervise Don Shuler, Manager at City-Wide and a Monarch employee, and other employees of City-Wide, to ensure that Pensmore was being built to the agreed-upon specifications.  Defendants breached that duty.  Defendants knew or should have known that Shuler was a hazard as a Plant Manager, and failed to exercise ordinary care to prevent the harm to plaintiff.

88.    Monarch is liable to plaintiff, directly, and for City Wide's conduct under *respondeat superior* and alter ego principles, as described above.  As a direct and proximate

24

result of defendants' breach, plaintiff suffered (and continues to suffer) injury and damage in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff requests that this Court enter judgment in favor of Steven T. Huff, LLC against defendants Monarch and City Wide as follows:

(i)     On its First Cause of Action, an award of damages for compensatory and actual damages, including but not limited to, benefit of the bargain, cost of repairs, harm to business reputation and exemplary damages;

(ii)    On its Second Cause of Action, an award of damages for compensatory and actual damages, including but not limited to, benefit of the bargain, cost of repairs, lost profits and specific performance;

(iii)   On its Third Cause of Action, an award of damages for compensatory and actual damages and exemplary damages including but not limited to, benefit of the bargain, cost of repairs, lost profits and specific performance;

25

(iv)     On its Fourth Cause of Action in the alternative, an award of damages in reliance on the promises made by defendants, including but not limited to, benefit of the bargain, cost of repairs, lost profits and specific performance;

(v)     On its Fifth Cause of Action, an award of damages for compensatory and actual damages and exemplary damages, including but not limited to, benefit of the bargain, cost of repairs, harm to business reputation and exemplary damages;

(vi)     On its Sixth Cause of Action, an award of damages for compensatory and actual damages, including exemplary damages;

(vii)     On its Seventh Cause of Action, an award, including disgorgement;

(viii)     On its Eighth Cause of Action,  an award of damages for compensatory and actual damages, including exemplary damages;

(ix)     On its Ninth Cause of Action, an award of damages for compensatory and actual damages, including exemplary damages;

(x)     Prejudgment interest;

(ix)     Post-judgment interest;

(x)     Reasonable attorneys' fees;

(xi)     Such other and further relief as the Court may deem just and proper.

SPH-2135740-3

## JURY TRIAL DEMAND

Under Fed. R. Civ. P. 38, plaintiff demands a trial by a jury on all issues that are triable to a jury.

Dated: February 26, 2015       Respectfully submitted,

HUSCH BLACKWELL LLP


BY        _____s/Bryan O. Wade_____
        Bryan O. Wade, MO Bar #41939
        Ginger K. Gooch, MO Bar #50302
        Husch Blackwell LLP
        901 St. Louis Street
        Suite 1800
        Springfield, MO  65806
        Telephone: 417.268.4000
        Facsimile: 417.268.4040
        Email:  bryan.wade@huschblackwell.com
                ginger.gooch@huschblackwell.com

KENNEDY BERG LLP

        Gabriel Berg NY Fed. Bar #: 4148
        *Pro Hac Vice motion to be filed*
        Kennedy Berg LLP
        401 Broadway – Suite 1900
        New York, New York 10013
        Telephone: 212.899.3400


        *Attorneys for Plaintiff Steven T. Huff Family, LLC*

SPH-2135740-3