IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN T. HUFF FAMILY, LLC | ) | |
| PENSMORE, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case no.: 6:15-CV-03214-BP |
| | ) | |
| v. | ) | |
| | ) | |
| THE MONARCH CEMENT COMPANY, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SUGGESTIONS IN SUPPORT OF DEFENDANT CITY WIDE CONSTRUCTION
PRODUCTS CO.'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS ..................... 2

III.   SUMMARY JUDGMENT STANDARD ....................................................... 14

IV.   ARGUMENT ................................................................................................... 15

      A.     Plaintiffs' "Breach Of Contract" Claim Is Time Barred. ..................... 15

      B.     Plaintiffs' Fraud Claim Is Barred By The Economic Loss Doctrine. ................... 17

      C.     Plaintiffs' "Good Faith And Fair Dealing" Claim Is Not A Separate Cause Of Action. ................................................................................ 18

      D.     Plaintiffs Cannot Recover "Cost To Rebuild" Or "Lost Opportunity" Damages. ......................................................................... 19

             1.     Cost to tear down and rebuild Pensmore. .................................. 19

             2.     "Lost Opportunity" Damages. ................................................... 25

             3.     Such Damages Are Not Recoverable Through Plaintiffs' Fraud Claim. ................................................................................ 27

      E.     Huff Family LLC's Claims Fail As A Matter Of Law. ....................... 27

V.     CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Allstate Indem. Co. v. Rice*,
    No. 4:12-CV-00178-BCW, 2013 WL 1314195 (W.D. Mo. Mar. 28, 2013),
    aff'd, 755 F.3d 621 (8th Cir. 2014)......................................................................27

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................15

*Ariel Preferred Retail Grp., LLC v. CWCapital Asset Mgmt.*,
    883 F. Supp. 2d 797 (E.D. Mo. 2012) .................................................................29

*Arthur v. Medtronic, Inc.*,
    123 F. Supp. 3d 1145, 1149 (E.D. Mo. 2015) .....................................................29

*Bus. Men's Assur. Co. of Am. v. Graham*,
    891 S.W.2d 438 (Mo. Ct. App. 1994) .................................................................23

*Celotex v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................14

*Clarex Ltd. v. Natixis Securities America LLC*,
    No. 12 CIV. 0722 PAE, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ...............28

*Clevenger v. Oliver Ins. Agency, Inc.*,
    237 S.W.3d 588 (Mo. 2007) ...............................................................................29

*De Long v. Broadston*, 272 S.W.2d 493 (Mo. Ct. App.1954) .....................................23

*Foam-Tex Ind., Inc. v. Relaxaway Corp.*,
    358 F. Supp. 8 (E.D. Mo. 1973)..........................................................................19

*Garner v. Barton*,
    No. 4:14-CV-200-CEJ, 2015 WL 1120085 (E.D. Mo. Mar. 12, 2015) ...............28

*Kelley v. Widener Concrete Const.*,
    401 S.W.3d 531 (Mo. Ct. App. 2013) ...........................................................22, 23

*Ken Cucchi Const., Inc. v. O'Keefe*,
    973 S.W.2d 520 (Mo. Ct. App. 1998) .................................................................22

*Kruger v. Subaru of Am., Inc.*,
    996 F. Supp. 451 (E.D. Pa. 1998) .......................................................................20

*Lerner v. Yeghishian*,
    271 S.W.2d 588 (Mo. Ct. App. 1954) ...............................................................20

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*,
    223 F.3d 873 (8th Cir. 2000) ...........................................................................17

*Maryland Supreme Corp. v. Blake Co.*,
    369 A.2d 1017 (1977).......................................................................................16

*Miller v. Stan Ortmeier Const. Co.*,
    426 N.W.2d 272 (Neb. 1988)...........................................................................20

*Nestlé Purina Petcare Co. v. Blue Buffalo Co. Ltd.*,
    181 F.Supp.3d 618 (E.D. Mo. 2016) ...............................................................18

*Ouellette Mach. Sys., Inc. v. Clinton Lindberg Cadillac Co.*,
    60 S.W.3d 618 (Mo. Ct. App. 2001) ...............................................................17

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*,
    322 S.W.3d 112 (Mo. 2010) ............................................................. 15, 16, 28

*Shelly Materials v. Great Lakes Crushing*,
    No. 2013-O-0016, 2013 WL 6810660 (Ohio Ct. App. Dec. 23, 2013)..................15

*Trademark Med., LLC v. Birchwood Lab., Inc.*,
    22 F. Supp. 3d 998, 1003 (E.D. Mo. 2014) .......................................................18

*Turner v. Andrew*,
    413 S.W.3d 272 (Ky. 2013).............................................................................27

*U.S. Neurosurgical v. St. Luke's Cancer Inst.*,
    328 S.W.3d 234 (Mo. Ct. App. 2010) .............................................................15

*United States v. Eleven Million Seventy-One Thousand One Hundred & Eighty-Eight Dollars & Sixty-Four Cents in U.S. Currency*,
    No. 4:12-CV-1559 CEJ, 2015 WL 630291 (E.D. Mo. Feb. 13, 2015) .................27

*White River Dev. Co. v. Meco Sys.*,
    806 S.W.2d 735 (Mo. Ct. App. 1991) .........................................................22, 23

*Wisch & Vaughan Const. Co. v. Melrose Props. Corp.*,
    21 S.W.3d 36 (Mo. Ct. App. 2000) ..................................................................26

**Statutes**

Mo. Rev. Stat. §400.1-203.....................................................................................18

Mo. Rev. Stat. §400.1-203, Comment 2.................................................................19

CORE/0053865.0033/130447494.28

Mo. Rev. Stat. § 400.2-275...................................................................................15

Mo. Rev. Stat. § 400.2-711.1................................................................................16

Mo. Rev. Stat. § 400.2-714.................................................................... 16, 19, 20, 22

Mo. Rev. Stat. § 400.2-715...................................................................................20

Mo. Rev. Stat. § 400.2-721...................................................................................26

Mo. Rev. Stat. § 400.2-725(2)..............................................................................17

**Other Authorities**

81 C.J.S. *Specific Performance* § 2, at 701-02 (1977)...............................................24

Fed. R. Civ. P. 56................................................................................................14

SPECIFIC PERFORMANCE, Black's Law Dictionary (10th ed. 2014).....................................24

CORE/0053865.0033/130447494.28

## I.    INTRODUCTION

City Wide Construction Products Co. ("City Wide") supplied concrete to Huff Construction, Inc. to be used in construction of Pensmore—an approximately 72,000-square-foot single-family residence near Highlandville, Missouri. Although Plaintiffs assert several causes of action, the crux of Plaintiffs' allegations is that City Wide supplied concrete to be used in the construction of Pensmore that did not contain the amount of Helix—steel fibers that can be mixed with concrete—Plaintiffs claim to have requested. Although City Wide is confident that the evidence at trial will prove that there was no "shortage" of Helix and that the results from "scientific testing" Plaintiffs allege in their Second Amended Complaint actually confirm Defendants' position, City Wide acknowledges that there are arguably disputed facts that prevent summary judgment relating to the merits of Plaintiffs' alleged "shorting scheme."

The undisputed facts in this case, however, make summary judgment appropriate with respect to three of the claims (breach of contract, fraud and breach of good faith and fair dealing) asserted by both Plaintiffs, the relief both Plaintiffs seek and all claims asserted by the Steven T. Huff Family, LLC. Specifically, any claims relating to Plaintiffs' allegation that City Wide failed to supply concrete with the proper amount of Helix are barred, at least in part, by the Missouri Uniform Commercial Code's ("UCC") four-year statute of limitations. Plaintiffs' fraud claim is barred by the economic loss doctrine. Plaintiffs' breach of the implied duty of good faith and fair dealing "claim" is not a separate claim and thus is barred to the extent Plaintiffs' breach of contract claim is barred.  The damages Plaintiffs seek—"cost to rebuild" and "lost opportunity" damages—are not recoverable under the UCC, would result in economic waste, and are impermissibly speculative.  And finally, although Pensmore, LLC is the owner of Pensmore, Steven T. Huff Family, LLC does not have standing as Pensmore, LLC's parent to assert any

claims against Defendants on Pensmore, LLC's behalf and also does not have any evidence that it, independently, can prove all of the elements of any of the claims it has asserted. Therefore, summary judgment is appropriate on these claims.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.    Plaintiffs Steven T. Huff Family, LLC ("Huff Family LLC") and Pensmore, LLC have asserted claims against City Wide for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel in the alternative, conversion, and unjust enrichment. *See generally* Second Amended Complaint ("Complaint") (Doc. 139).

2.    Pensmore, LLC owns Pensmore. *See* Exhibit 1 (D0003398-99).

3.    For their breach of contract claim, Plaintiffs allege:

> Plaintiffs, on the one hand, and Monarch and City Wide on the other, entered into a binding implied in fact or oral contract, from October 2009 through November 2012, to build the Pensmore complex. Defendants were to provide the ready-to-mix concrete and construct the concrete walls according to Pensmore's specifications, and Pensmore was to provide the Helix™ and pay defendants for the construction. Specifically, defendants, through Don Shuler, the whistleblower and others, and Pensmore, through its representatives agreed: four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours. Mid-sized pours required six boxes of Helix™ per eight-yard truck. The highest dosage pours required eight boxes per eight-yard truck and some required ten boxes per eight-yard truck. Plaintiffs and defendants agreed to the exact number of boxes to be used, per eight-yard pour, depending on which portion of the structure was being built – prior to each pour.
>
> Plaintiffs performed their contractual obligations by ordering over 200,000 pounds of Helix™, paying for the Helix™ in full, and having it delivered to defendants' offices, as well as making payments to City Wide for the ongoing construction of Pensmore. From October 7, 2009 through November 20, 2012, Monarch and City Wide breached their contractual obligations to plaintiffs by shorting the amount of Helix™ used in virtually every concrete pour in the construction of Pensmore. Defendants used two boxes of Helix™ instead of four for every 8 yards-mixed, or four boxes of Helix™ instead of six, six boxes of Helix™ instead of eight, and eight boxes of Helix™ instead of ten. The excess, unused boxes of

-2-

> Helix™ were returned to defendants' offices and hidden from plaintiffs and its representatives.

Complaint (Doc. 139) at ¶ 101-102; *see also* Plaintiff's Responses to Defendant Monarch Cement Company's Second Set of Interrogatories,[1] attached hereto as Exhibit 2, at 10-11 (responding to Interrogatory 19, which asked Plaintiffs to identify all facts, documents and/or anticipated testimony that they contend support their claim that defendants breached their contract with Plaintiffs).

    4.    For their fraud claim, Plaintiffs allege:

> From October 7, 2009 through November 20, 2012, defendants made a series of false and misleading statements and omissions of material fact to representatives of Pensmore to induce plaintiffs to pay defendants to construct Pensmore. These misstatements and omissions include: a. The amount of Helix™ to be used for each pour was identified and agreed by the parties, including the Whistleblower and Don Shuler for defendants and duly authorized Pensmore representatives, *before* each and every pour. Prior to the **Basement Wall pours** on October 28, 2009, December 22, 2009, January 19, 2010, March 5, 2010, March 6, 2010 and March 17, 2010; **First Level Floor pours** on March 29, 2010, April 8, 2010, April 9, 2010, April 12, 2010, April 14, 2010, April 19, 2010, April 20, 2010, April 26, 2010, April 27, 2010, April 28, 2010 and May 4, 2010; **Second Level Floor pours** on July 21, 2010, July 23, 2010, October 5, 2010, October 7, 2010, November 3, 2010, November 15, 2010, November 19, 2010, December 3, 2010 and January 29, 2011; **First Level and Tunnel Wall pours** on June 23, 2010, July 27, 2010, August 17, 2010, September 15, 2010, September 17, 2010 (two pours), October 26, 2010, October 27, 2010 and November 2, 2010; **Second Level Wall pours** on December 9, 2010, January 27, 2011, March 10, 2011, April 13, 2011, April 28, 2011 and June 15, 2011; **Attic and various other Wall pours** on May 18, 2011, August 11, 2011, August 26, 2011, September 21, 2011, October

---

[1] Plaintiff Pensmore, LLC was just recently added to the litigation. It is City Wide's understanding that, to minimize any prejudice caused to the Defendants by adding an additional plaintiff over a year after the deadline for the joinder of additional parties, after the time for serving written discovery requests had passed, and after fact depositions had concluded, that the disclosures and discovery responses of Steven T. Huff Family, LLC and deposition responses of Steven Huff, as corporate representative of Steven T. Huff Family, LLC, apply equally to Pensmore, LLC. As a result, the Statement of Uncontroverted Material Facts refers to Plaintiffs' discovery responses, disclosures and corporate representative's testimony based on that understanding.

CORE/0053865.0033/130447494.28

13, 2011 (two pours that day), November 17, 2011, December 8, 2011 and December 21, 2011; and **Attic Floor pours** on March 29, 2011, April 6, 2011, April 13, 2011, June 10, 2011, June 14, 2011, June 15, 2011, June 20, 2011, June 27, 2011, July 1, 2011, August 2, 2011, October 25, 2011, December 30, 2011, January 23, 2012 (two pours) February 1, 2012, February 20, 2012, March 1, 2012, March 26, 2012 (two pours) May 21, 2012, June 30, 2012, August 24, 2012, November 1, 2012 and November 20, 2012 -- defendants affirmatively represented that four boxes of Helix™ were required per eight-yard concrete truck for the lowest dosage pours, six boxes of Helix™ per eight-yard truck for mid-sized pours, eight boxes per eight-yard truck and ten boxes per eight-yard truck for higher dosage pours.

From October 28, 2009 through November 20, 2012, defendants assured Pensmore that the appropriate boxes of Helix™ were being used for each pour, concealing from Pensmore that two boxes of Helix™ instead of four for every eight yards-mixed, four boxes of Helix™ instead of six, six boxes of Helix™ instead of eight, and eight boxes of Helix™ instead of ten boxes of Helix™.

From October 28, 2009 through November 20, 2012, defendants concealed that the boxes of Helix™ not used were loaded onto defendants' trucks, driven back to defendants' facilities and hidden from Pensmore.

From October 28, 2009 through November 20, 2012, defendants misrepresented that they were using the appropriate amount of Plasticizer, concealing that defendants watered down the Plasticizer, and often failed to include any Plasticizer at all.

Defendants knew that the false and misleading statements and omissions were false at the time they were made. Defendants made these false representations to give the appearance that the proper amounts of Helix™ and Plasticizer were being used, concealing that they were shorting the proper amount of Helix™ actually used and watering down the plasticizer, or not using it at all. Defendants continued to be paid by Pensmore for mixing, pouring and laying 200,000 pounds of Helix™ with concrete, secretly hiding from Pensmore countless boxes of Helix™ which, on information and belief, were resold by defendants.

Defendants made these false representations with the intention that plaintiffs would rely on them and continue to pay defendants to construct Pensmore. Plaintiffs justifiably relied on defendants' false statements and omissions by, among other things: (1) buying over 200,000 pounds of Helix™ to be used to build Pensmore based on the parties' understanding of the amounts required per pour, on October 7, 2009, February 1, 2010, December 1, 2010, October 31, 2011, November 6, 2011 and May 8,

- 4 -

2012; (2) delivering the Helix™ to defendants' facilities; (3) paying, in full, for defendants to build Pensmore; and (4) promoting publicly, including on the *Today Show*, that Pensmore could withstand a F5 tornado and a bomb blast.

Complaint (Doc. 139) at ¶¶ 94-97 (emphasis in original); *see also* Plaintiff's Responses to Defendant Monarch Cement Company's Second Set of Interrogatories, attached hereto as Exhibit 2, at 7-10 (responding to Interrogatory 18, which asked Plaintiffs to identify all facts, documents and/or anticipated testimony that they contend support their claim that defendants committed fraud).

  5. For their breach of the duty of good faith and fair dealing "claim," Plaintiffs allege:

> Inherent in every contract in the State of Missouri is an implied covenant of good faith and fair dealing. The covenant includes the assurance that a party to the contract will not take measures to undermine the other contracting party's ability to appreciate the benefits of the contract.
>
> As stated above, plaintiffs and defendants had a valid and enforceable implied in fact and/or oral contract. Defendants, by deliberately "shorting" the amount of Helix™ and Plasticizer used to construct Pensmore, attempted to deprive Pensmore of the benefits of the implied in fact agreement.
>
> Defendants' bad faith and malicious misconduct in deliberately shorting the amount of Helix™ and Plasticizer used to construct Pensmore, constitutes a violation of the implied covenant of good faith and fair dealing contained in the implied in fact and/or oral contract.

Complaint (Doc. 139) at ¶¶ 105-107; *see also* Plaintiff's Responses to Defendant Monarch Cement Company's Second Set of Interrogatories, attached hereto as Exhibit 2, at 11-12 (responding to Interrogatory 20, which asked Plaintiffs to identify all facts, documents and/or anticipated testimony that they contend support their claim that defendants breached the implied duty of good faith and fair dealing).

  6. City Wide supplied concrete to be used in the construction of Pensmore but did not pour or place the concrete.  Affidavit of David Calhoun, attached hereto as Exhibit 3, at ¶ 2.

  7. City Wide did not construct Pensmore.  Affidavit of David Calhoun (Ex. 3) at ¶ 3.

- 5 -

8. Invoices, batch tickets and account receivable reports relating to the concrete supplied by City Wide for the Pensmore project reflect Huff Construction, Inc. as the customer/buyer and City Wide as the seller. Affidavit of David Calhoun, attached hereto as Exhibit 3, at ¶¶ 4-6 (attaching sample invoices, batch tickets and account receivable reports).

9. Invoices relating to the Helix delivered to City Wide for the Pensmore project reflect Huff Construction as the entity to be billed and does not identify Plaintiffs. *See* Exhibit 4 (HUFF_0005431, HUFF_0019553, HUFF_0019555, HUFF_0019556 and HUFF_0019557).

10. Plaintiffs claim that the first concrete delivery at issue was made on October 28, 2009. Complaint (Doc. 139) at ¶ 4 ("From October 28, 2009 through November 20, 2012, defendants "shorted" the amount of Helix™ that they agreed to use in constructing Pensmore. On most days that the Helix™ was mixed with concrete at defendants' facilities, they deliberately failed to use countless boxes of Helix™. Instead, defendants put enormous quantities of Helix™, paid for by Pensmore and dedicated for use at Pensmore, on their trucks and drove them to a storage area, hidden from Pensmore's representatives. Separately, the amount of plasticizer, an additive to strengthen the walls and maximize the effectiveness of Helix™, was watered down by defendants, or not used at all.") and ¶ 44 ("From October 2009 through November 2012, as the construction work was performed by defendants on Pensmore, the Helix™ mixed concrete was not what it was supposed to be – and not the amount for which Pensmore bargained. On October 28, 2009, defendants poured the first basement walls, shorting Pensmore by over 3,000 pounds of Helix.").

11. Defendants and Plaintiff Huff Family LLC entered into a tolling agreement dated March 3, 2015. *See* Standstill and Tolling Agreement and amendments attached hereto as Exhibits 5-6.

12. Huff Family LLC initiated this lawsuit on May 23, 2015. *See generally* Original Complaint (Doc. 1).

13. Pensmore, LLC first asserted claims against Defendants on February 2, 2017. *See generally* Complaint (Doc. 139).

14. Defendants' Notice of 30(b)(6) Deposition to Plaintiffs identified the matters upon which examination was requested. *See* Defendants' Notice of 30(b)(6) Deposition to Plaintiff, attached hereto as Exhibit 7.

15. Steve Huff, as corporate representative for Plaintiffs, testified that Pensmore was constructed primarily to be his family's home, although he testified that it would not necessarily be his family's full-time residence. Transcript from Deposition of Steven T. Huff as Corporate Representative, excerpts attached as Exhibit 8, at 234:1-11.

16. Plaintiffs' corporate representative, Steve Huff, testified that he thinks Pensmore, as allegedly built,[2] is "stronger than most structures." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 212:19-23.

17. Plaintiffs' corporate representative, Steve Huff, testified that, as allegedly built, Pensmore would be a habitable structure and "would meet code." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex.8) at 201:11-202:1; 130:19-23.

18. Plaintiffs' corporate representative, Steve Huff, testified that Pensmore, as allegedly built, "would still be safer than, you know, a wood frame structure." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 201:11-202:1.

---

[2] As used in herein, "as built" or "as allegedly built" refers to Pensmore, as is—with the alleged under-dosage of Helix in the concrete. "As designed" or "as allegedly designed" refers to Pensmore as Plaintiffs allege that it was designed to be built.

CORE/0053865.0033/130447494.28

19.     When asked to assume that he decides to finish construction of Pensmore instead of tear it down, Plaintiffs' corporate representative, Steve Huff, testified that he would be able to live in it once it is completed.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 200:15-25.

20.     Plaintiffs' corporate representative, Steve Huff, testified that, with respect to the actual design criteria used for Pensmore and the loads Mr. Huff was designing towards, "they were all in [his] head at the time" and this "was not a typical project where you prepared specification documents and issued them to somewhere else."  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 138:7-16.

21.     Plaintiffs' corporate representative, Steve Huff, testified that he designed Pensmore.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 86:11-12.

22.     When Plaintiffs' corporate representative, Steve Huff, was asked during his deposition what strength of a tornado Pensmore, as designed, could withstand that Pensmore, as constructed, could not withstand, he responded, "I haven't run those numbers, but the problem is you can't -- in the real world, those things are all just rules of thumb. They don't correspond to the real world. In the real world, all kinds of things happen that you don't expect. So nobody -- that's why they have all these rules of thumb; right? I mean, it's like many body problems in physics haven't been solved. So, you know, I -- I designed and chose for an element of strength that it does not have now apparently, and if that's the case, you know, then there will be scenarios. You know, I can't tell you exactly which ones. You can do a simple calculation or we could have somebody go do a simple calculation, but that doesn't necessarily tell you the real

CORE/0053865.0033/130447494.28

world." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 146:11-147:6.

23.      When Plaintiffs' corporate representative, Steve Huff, was asked during his deposition, "so you're not sure or you don't think that [Pensmore] could withstand, as constructed, an EF-5 tornado", he responded, "I – I just don't know." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 149:5-8.

24.      When Plaintiffs' corporate representative, Steve Huff, was asked during his deposition, "do you that that Pensmore as constructed could withstand an F-5 tornado," he testified, "I don't think-- I doubt it" but went on to state, "all I can tell you is it would not have the strength it would have before. And there will be scenarios in which it would fail. I can't with confidence paint you a precise picture of that. I honestly can't." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 147:7-148:7.

25.      Plaintiffs' corporate representative, Steve Huff, testified that no testing has been performed to determine what type of tornado Pensmore, as designed, could withstand or what type of tornado Pensmore, as constructed, could withstand. Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 318:12-22.

26.      Plaintiffs' corporate representative, Steve Huff, testified that in a true F-5 tornado scenario, he "would not guarantee the windows against debris intrusion" and that "they're clearly much weaker than the walls, the structural system." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 208:13-23.

27.      Plaintiffs' corporate representative, Steve Huff, testified that Pensmore, as constructed, achieves Plaintiffs' goals that Pensmore be highly sustainable, low maintenance and

CORE/0053865.0033/130447494.28

energy efficient.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 108:13-111:7.

28.     Plaintiffs' corporate representative, Steve Huff, testified that Pensmore, as constructed, is one of the greenest structures in the world.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 211:24-212:5.

29.     Plaintiffs' corporate representative, Steve Huff, testified that Pensmore, as constructed, "it's stronger than most structures." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 212:6-23.

30.     Plaintiffs' corporate representative, Steve Huff, testified that he and others have been staying in the guest wing portion of Pensmore for approximately three years.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 235:6-8.

31.     Plaintiffs' corporate representative, Steve Huff, testified that if Pensmore is not torn down, it will cost about $3 million to complete.  Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 286:5-9.

32.     Plaintiffs' corporate representative, Steve Huff, testified that there was no intention to ever rent out or lease portions of Pensmore or to use Pensmore for profit in any way. Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 233:21-25.

33.     Plaintiffs' corporate representative, Steve Huff, testified that he has hosted events at Pensmore already and any shortage of Helix in the concrete will not prevent him from hosting events at Pensmore in the future.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 201:8-202:1.

34.     Plaintiffs' corporate representative, Steve Huff, testified that even if it did not contain any Helix, Pensmore "would still be to code. It would be a robust structure, but it would

- 10 -

not be what I designed or intended or paid for it to be." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 149:25-150:14.

35.     Plaintiffs' corporate representative, Steve Huff, testified that he wanted Pensmore to serve as a laboratory to bring students in to get them interested in science and technology and to give them a place to do experiments. Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 229:4-230:10.

36.     Plaintiffs' corporate representative, Steve Huff, testified that Pensmore has already started to be used as a laboratory but that its use as a laboratory is limited at the moment because the structure is not yet finished.  Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 230:11-19.

37.     Plaintiffs' corporate representative, Steve Huff, testified that once finished, even as constructed, Pensmore can be used for experiments on the thermal aspects of Pensmore and "[t]hings that have to do with disasters, parts of it, those we could do experiments by doing things in laboratory" but he would not feel "comfortable doing anything that sort of showed the benefit, the additional helix and the structure at this point because I don't know what the dosage is throughout the structure." Transcript from Deposition of Steven T. Huff as Corporate Representative (Ex. 8) at 230:20-233:14.

38.     Jared Gorham has performed construction work at Pensmore and testified that he is continuing to do work at the Pensmore, including performing work on the stone cladding for Pensmore, epoxying floors, adding electric boxes and painting ceiling joists for aesthetic purposes.  Transcript of Jared Gorham, excerpts attached as Exhibit 9, at 47:2-48:1.

39.     Jonathan Pohlsander also performs construction work at Pensmore and testified that, since late 2014, work continues to be performed at Pensmore including steel stud framing

- 11 -

on the main house portion of Pensmore, finish work on the guest wing portion, exterior cladding work, work on electrical solar panels on the rooftop, work on the geothermal system, plumbing work, some sheetrock work, epoxying floors and elevator work. Transcript of Jonathan Pohlsander, excerpts attached as Exhibit 10, at 46:14-50:3.

40.    Defendants' valuation expert opined that that there is no diminution in value for Pensmore to the typical buyer if Plaintiffs' allegations that there was a "shortage" of Helix in the concrete used to construct Pensmore are true, and that even an atypical buyer willing to pay a premium for the added strength would not pay more than 1%-2% of the fair market value of the house (estimated to be about $81,000 to $162,000), even if the alleged decrease in the amount of Helix in the concrete had a material impact on the strength of Pensmore. Valbridge Appraisal Report dated February 1, 2017, attached hereto as Exhibit 11 at 53-55.

41.    According to Plaintiff's Rule 26(a)(1) Supplemental Disclosures, "Plaintiff's damages are detailed in the Initial Expert Report by economist David Paris. Plaintiff will also ask the jury for exemplary damages in an amount sufficient to punish defendants for their willful misconduct and to deter defendants from ever defrauding any other person again. Mr. Paris will testify, in detail, about each element of Plaintiff's damages." Plaintiff Steven T. Huff Family, LLC's Rule 26(a)(1) Supplemental Disclosures, attached hereto as Exhibit 12.

42.    Neither Mr. Paris's Initial nor Supplemental Reports contain an opinion concerning the value of the concrete Plaintiffs allege was delivered by City Wide compared to the value of the concrete Plaintiffs alleges it should have received. *See generally* Initial Report of David N. Paris and Supplemental Report of David N. Paris, attached hereto as Exhibits 13 and 14.

43. In his reports, Mr. Paris has identified two items of claimed damages relating to Plaintiffs' contractual claims: (1) cost to tear down and rebuild Pensmore calculated by Mr. Paris at between $16.56 million and $18.98, and (2) "lost opportunity cost of the $16 million that Huff Family funded [Huff Construction, Inc.] to build Pensmore between September 2008 and April 2016" calculated by Mr. Paris at $13,267,200. Initial Report of David N. Paris (Ex. 13) at ¶¶ 5(d), 5(e), 34, 36, 38; Supplemental Report of David N. Paris (Ex. 14) at ¶¶ 2, 4.

44. In his Initial Report, Mr. Paris states, "[t]he damages to the Huff Family as a result of the reported Helix shorting scheme may also include out-of-pocket expenses." Initial Report of David N. Paris (Ex. 13) at ¶ 49.

45. Neither of Mr. Paris's reports contains a calculation of the "Huff Family's" alleged out-of-pocket expenses. Initial Report of David N. Paris (Ex. 13) at ¶ 49; *see generally* Supplemental Report of David N. Paris (Ex. 14).

46. In his Initial Report, Plaintiffs' damages expert, David Paris, states: "I understand that because Pensmore was intended to be a unique structure, and the magnitude of the reported Helix shorting scheme, the specific performance sought by the Huff Family would require the demolition of the current structure and the rebuilding of Pensmore on the same site." Initial Report of David N. Paris (Ex. 13) at ¶ 31.

47. Plaintiffs' expert, David Paris, stated in his Initial Report that Plaintiffs have incurred $1,406,075.80 in construction costs in 2015 and $393,023.72 in construction costs in 2016 as of the date of his Initial Report (May 23, 2016). Initial Report of David N. Paris (Ex. 13) at ¶ 19.

48. Alan Harter, the Huff family's financial advisor, testified that the funds used to pay for the construction of Pensmore came from cash on hand and stated that "there was no

liquidations to cover this disbursements or these disbursements." Transcript of Alan Harter, excerpts attached as Exhibit 15, at 10:8-11, 24:12-26:14.

49.     Mr. Harter also testified that the only assets of which he is aware that are owned by Pensmore, LLC are Pensmore and a bank account through Fidelity Investments, which largely contains cash with a minimal rate of return and that he has not made any investments on behalf of Pensmore, LLC other than the cash account. Transcript of Alan Harter (Ex.15) at 16:14-17:11, 21:8-14.

50.     Mr. Harter also testified that Huff Family LLC was not a direct participant in the investments reflected on the report summarizing the Huff family's (used ubiquitously) alternative investments. Transcript of Alan Harter (Ex.15) at 32:12-39:6, 78:7-81:9.

51.     In Mr. Paris's "Supplemental Report," he opined that the "Huff Family" would have invested the funds used to construct Pensmore and received from November 2009 through October 2016 at the rate of return reflected on Mr. Harter's alternative investment review summary. Supplemental Report of David N. Paris (Ex. 14) at ¶¶ 3 and 4.

52.     Mr. Harter testified that when his current firm was started in 2011, he had investment options available to pursue for the Huff Family that he had not had available previously. Transcript of Alan Harter (Ex. 15) at 112:13-113:24.

## III.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of showing the absence of any genuine issue of material fact, which can be accomplished by showing that no evidence exists to support the non-moving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving

- 14 -

party meets its burden, the burden shifts to the non-moving party to show the existence of a disputed issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The non-moving party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* The mere existence of some alleged factual dispute will not defeat an otherwise meritorious summary judgment motion. *Id.*

## IV. ARGUMENT

### A. Plaintiffs' "Breach Of Contract" Claim Is Time Barred.

Plaintiffs contend that Defendants and Plaintiffs entered into an implied-in-fact or oral contract requiring City Wide to supply Helix-dosed ready-mix concrete according to Plaintiffs' specifications to be used in the construction of Penmsore.[3] Statement of Uncontroverted Material Facts ("SOF") 3. Plaintiffs further contend that Defendants breached that contract by "shorting" the amount of Helix added to the concrete City Wide supplied. SOF 3. Assuming for purposes of this Motion only that Plaintiffs are able to establish that at least one of the Plaintiffs had an enforceable agreement with at least one of the Defendants and that Plaintiffs are able to establish that one or both of the Defendants breached that agreement, Plaintiffs' claims based on that agreement are barred by the four-year statute of limitations found in Mo. Rev. Stat. § 400.2-275 for an action for breach of any agreement relating to the sale of goods.[4]

---

[3] The Missouri Supreme Court criticized the plaintiffs in *Renaissance Leasing, LLC v. Vermeer Manufacturing. Co.*, because they, like the Plaintiffs in this case, created confusion in their pleading by referring to multiple entities collectively by a single name, thus conflating the parties' interests and creating confusion about which party was allegedly entitled to relief under each theory. 322 S.W.3d 112, 120 (Mo. 2010). The Court found that each plaintiff had to separately prove each element of each claim. *Id.* With respect to claims or portions of claims that fail regardless of the identity of the plaintiff, City Wide has not attempted to correct the confusion Plaintiffs have attempted to create.

[4] If the contract is primarily for the sale of goods, such as the concrete City Wide sold that is at issue here, the UCC applies. *U.S. Neurosurgical v. St. Luke's Cancer Inst.*, 328 S.W.3d 234 (Mo.

When a buyer accepts goods and then later brings a claim alleging that the goods did not conform with the parties' contract, the claim is actually one for breach of warranty. *Renaissance Leasing, LLC v. Vermeer Mfg. Co*., 322 S.W.3d 112, 130–31 (Mo. 2010) (only remedies for breach of warranty are available to a buyer who accepted the goods but then discovers that the goods are defective in some manner); *see also* Mo. Rev. Stat. § 400.2-711.1 (identifying remedies for breach of contract where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance) and § 400.2-714 (identifying remedies for breach of warranty). As the Missouri Supreme Court explained in *Renaissance Leasing*:

> The remedies for breach of contract are set forth in section 2-711 and are available to a buyer "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." § 400.2-711.1. The remedies for breach of warranty are set forth in section 2-714 and are available to a buyer who has finally accepted goods, but discovers that the goods are defective in some manner. § 400.2-714; *see also* 1 White & Summers, *UCC* 702-3 ("We believe that only buyers who have accepted and neither rightfully rejected nor effectively revoked can use 2-714."). Here, the plaintiffs do not assert that Great Plains failed to make delivery or repudiated or that Crush rightfully rejected or justifiably revoked acceptance. There is no dispute that Crush accepted delivery of the T1055 and notified Great Plains about the machine's inability to perform terrain leveling adequately. Accordingly, Renaissance and TEAM cannot recover under section 400.2-711 for breach of contract. Their contract claims are subsumed by their breach of warranty claims for damages under section 400.2-714, which already have been addressed above. Plaintiffs' breach of contract claims fail as a matter of law.

*Renaissance Leasing,* 322 S.W.3d at 131. Plaintiffs do not contend that they rejected the concrete City Wide provided. As a result, although not pled as such, Plaintiffs, at most, have a claim for breach of warranty.

---

Ct. App. 2010), as modified, (Nov. 2, 2010); *see also Shelly Materials v. Great Lakes Crushing,* No. 2013-O-0016, 2013 WL 6810660 , at * 7 (Ohio Ct. App. Dec. 23, 2013) ("Given that Medina Supply's ready-mix concrete could be transported from the plant to a construction site, it is considered 'goods' under the governing definition"); *Maryland Supreme Corp. v. Blake Co.,* 369 A.2d 1017, 1025 (1977) (stating, in relation to a contract for concrete, "[a]s we have indicated, what is involved here is the sale of goods within the contemplation of the UCC").

- 16 -

A breach of warranty under the Missouri UCC occurs "when tender of delivery is made."[5] Mo. Rev. Stat. § 400.2-725(2). Plaintiffs claim that the first concrete delivery at issue was made on October 28, 2009. SOF 10. As a result, Plaintiffs' claim accrued on October 28, 2009, when Plaintiffs contend that City Wide delivered concrete with the incorrect Helix dosage, regardless of when Plaintiffs claim to have learned of the alleged breach. Mo. Rev. Stat. § 400.2-725(2) ("A cause of action accrues the when breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."). Huff Family LLC did not bring its breach of contract claim until May 23, 2015, when it initiated this lawsuit, although Defendants and Huff Family LLC had entered into a tolling agreement dated March 3, 2015. SOFs 11-12. Pensmore, LLC did not bring its breach of contract claim until February 2, 2017 and was not a party to the tolling agreement. SOFs 11,13. Thus, both Plaintiffs' claims are time-barred because they were not brought by October 28, 2013—within four years of the first alleged non-conforming delivery.

Even if each delivery is considered separately, Defendants are entitled to summary judgment on Huff Family LLC's claim relating to concrete delivered prior to March 3, 2011 (4 years prior to the execution of the tolling agreement) and are entitled to summary judgment on Pensmore, LLC's claim relating to concrete delivered prior to February 2, 2013.

**B.      Plaintiffs' Fraud Claim Is Barred By The Economic Loss Doctrine.**

The economic loss doctrine bars fraud claims based on representations concerning the quality of the goods sold because they are "substantially redundant" with warranty claims. *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,* 223 F.3d 873, 885 (8th Cir. 2000). Recently,

---

[5]The single exception is when there is an express warranty that explicitly extends future performance of the goods. Mo. Rev. Stat. § 400.2-725(2). For such exception to apply, the terms of the warranty "must unambiguously indicate the manufacturer is warranting the future performance of the goods for a specific period of time." *Ouellette Mach. Sys., Inc. v. Clinton Lindberg Cadillac Co.,* 60 S.W.3d 618, 621 (Mo. Ct. App. 2001).

CORE/0053865.0033/130447494.28

the United States District Court for the Eastern District of Missouri dismissed a fraud claim against a seller of mouthwash because the allegedly fraudulent representations—that the mouthwash would be mixed with purified water and was safe for use—arose out of the same facts that served as the basis of the plaintiffs' breach of warranty claims. *Trademark Med., LLC v. Birchwood Lab., Inc.*, 22 F. Supp. 3d 998, 1003 (E.D. Mo. 2014). *See also Nestlé Purina Petcare Co. v. Blue Buffalo Co. Ltd.*, 181 F.Supp.3d 618 (E.D. Mo. 2016) (in a suit alleging misrepresentations and concealment concerning the type, quality and character of ingredients sold that were used to manufacture dog food, the court found that the economic loss doctrine barred the fraudulent misrepresentation/ concealment claim because they were substantially redundant of the contract (breach of warranty) claims). As in *Trademark* and *Nestlé Purina*, Plaintiffs' allegations here—that Defendants represented that they were supplying concrete containing the requested Helix dosage and including the proper amount of plasticizer—arise out of the same facts that serve as the basis of Plaintiffs' breach of contract/warranty claim. SOFs 3-4. As a result, Defendants are entitled to judgment on Plaintiffs' fraud claim as a matter of law.

### C. Plaintiffs' "Good Faith And Fair Dealing" Claim Is Not A Separate Cause Of Action.

Plaintiffs assert a claim for breach of the covenant of good faith and fair dealing. SOFs 1, 5. The covenant of good faith and fair dealing is not an independent cause of action separate from Plaintiffs' breach of contract claim. The Official Comment to Mo. Rev. Stat. §400.1-203, which imposes an obligation of good faith in contracts for the sale of goods, states:

> This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial power or right. This distinction makes it clear that the doctrine of good faith merely directs a court toward interpreting contracts within the commercial context in which they were created,

CORE/0053865.0033/130447494.28

performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

Mo. Rev. Stat. §400.1-203, Comment 2. As a result, to the extent Defendants are entitled to summary judgment with respect to either Plaintiffs' breach of contract claim, or any portion thereof, Defendants are likewise entitled to summary judgment with respect to Plaintiffs' breach of the implied duty of good faith and fair dealing "claim." *See* Parts IV.A (seeking summary judgment because Plaintiffs' contractual claims are time-barred); IV.D (seeking summary judgment concerning the measure of Plaintiffs' alleged contractual damages); IV.E (seeking summary judgment against Huff Family LLC because it lacks standing).

### D. Plaintiffs Cannot Recover "Cost To Rebuild" Or "Lost Opportunity" Damages.

Plaintiffs rely on their damages expert, David Paris, for calculation of their alleged damages. SOF 41. Mr. Paris has identified two items of claimed damages relating to Plaintiffs' contractual claims. SOF 43. The first item is the "cost to tear down and rebuild Pensmore," calculated at between $16.56 million and $18.98 million. SOF 43. The second item is the "lost opportunity cost of the $16 million that Huff Family funded [Huff Construction, Inc.] to build Pensmore between September 2008 and April 2016." SOF 43. In a "supplement" to his report, Mr. Paris calculated the "lost opportunity cost" at $13,267,200. SOF 43.

#### 1. Cost to tear down and rebuild Pensmore.

The correct measure of damages for breach of warranty is the difference between the value of the goods when the buyer accepted delivery and the value they would have had if they had been as warranted. Mo. Rev. Stat. § 400.2-714. Even though Plaintiffs bear the burden of establishing such difference, Mr. Paris has not opined on the value of the concrete Plaintiffs allege was delivered compared to the value of the concrete Plaintiffs allege City Wide represented it provided. SOF 42; *see also Foam-Tex Ind., Inc. v. Relaxaway Corp.*, 358 F. Supp.

- 19 -

8, 14 (E.D. Mo. 1973) (buyer could not recover for nonconforming goods because buyer failed to disclose any difference in value between the goods delivered and goods that would have conformed); *Lerner v. Yeghishian*, 271 S.W.2d 588, 591 (Mo. Ct. App. 1954) (plaintiff has the burden of establishing the difference in the value).[6]

"In a proper case," a buyer may also recover incidental and consequential damages. Mo. Rev. Stat. § 400.2-714. Incidental damages are defined under the UCC as "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Mo. Rev. Stat. § 400.2-715. Although at the very end of Mr. Paris's report, he states that "[t]he damages to the Huff Family as a result of the reported Helix shorting scheme may also include out-of-pocket expenses," Mr. Paris has not opined concerning such damages or attempted to calculate such damages. SOF 44-45.

The UCC defines consequential damages to include "any loss resulting from general or particular requirements and the needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise," and "injury to person or property proximately resulting from any breach of warranty." Mo. Rev. Stat. § 400.2-715. Here, the evidence is that the Pensmore was constructed primarily to be a second home for Steve Huff and his family. SOF 15. Plaintiffs' corporate representative, Steve Huff, admitted during

---

[6] *See also Miller v. Stan Ortmeier Const. Co.*, 426 N.W.2d 272, 276 (Neb. 1988) (UCC case finding that "[d]amages, like any other element of plaintiff's cause of action, must be pled and proved, and the burden is on plaintiff to offer evidence of difference in value, if the judgment is to be based on that measure"); *Kruger v. Subaru of Am., Inc.*, 996 F. Supp. 451, 455 (E.D. Pa. 1998) ("Subaru then argues that the plaintiffs have not shown the difference in value between the car as warranted and the car as actually delivered and thus have failed to meet their evidentiary burden on an essential element of their case. I agree.").

- 20 -

his deposition that even if Plaintiffs' allegations relating the alleged "shorting scheme" are true, Pensmore is structurally stable, stronger than most structures and complies with building codes, if any applied. SOF 16-18, 29. He further admitted that the Pensmore can be lived in, as constructed, once it is finished. SOF 19.

Although Plaintiffs contend that they also wanted the structure to be strong enough to withstand certain tornadic activity, Plaintiffs acknowledge that the design criteria was in Mr. Huff's head at the time Pensmore was constructed and that the project was not a typical project where specification documents were prepared and issued to others. SOF 20. But even if City Wide had been or should have been aware of any special needs or requirements at the time it delivered the concrete, Plaintiffs have no evidence that the concrete supplied doesn't meet those special needs or requirements or that they suffered a loss as a result of any failure to meet those special needs or requirements. Mr. Huff, who largely designed Pensmore, testified as corporate representative that he doesn't know if Pensmore, with the alleged under-Helix-dosed concrete, would not withstand an F-5 tornado. SOF 21-25. He further acknowledged that in a tornado, he would not guarantee the windows against flying debris, noting that they are much weaker than the walls/structural system. SOF 26.

The other "goals" Plaintiffs hoped to achieve with respect to Pensmore related to sustainability, level of maintenance and energy requirements. SOF 27. Plaintiffs admit that Pensmore, as allegedly built, has low energy requirements and is highly sustainable and low maintenance. SOF 27. In fact, Plaintiffs acknowledge that Pensmore, as allegedly built, is one of the greenest structures in the world. SOF 28.

Consequential damages can also include damages for injuries to person or property proximately resulting from the non-performing good. Plaintiffs do not claim, though, that the

- 21 -

allegedly non-conforming concrete injured anyone or injured a person or property. For example, this is not a case in which the seller supplied an appliance that caught fire and caused property damage to a home or injured someone inside. Thus, Plaintiffs' cannot recover consequential damages because there is no evidence (1) that Pensmore, as designed, would have achieved Plaintiffs' special needs or requirements or that Pensmore, as constructed (with the allegedly under-dosed concrete), is unable to achieve Plaintiffs' special needs or requirements, (2) that, even if there were special needs or requirements, that City Wide knew or should have known of such special needs or requirements and (3) of an actual loss or injury caused by the alleged nonconforming concrete. But even if there was evidence of damages qualifying as consequential damages under the UCC, the law does not support the remedy Plaintiffs seek—the cost to tear down and rebuild Pensmore—because such remedy would amount to economic waste.

Even when a plaintiff is not limited by the measure of damages set forth in Mo. Rev. Stat. § 400.2-714 (value of the product when the buyer accepted delivery and the value it would have had if it had been as warranted), the law does not support the type of remedy Plaintiffs seek because it would require destruction of a useable structure. There are two standards for the measure of damages in construction defect cases: cost of repair or replacement and diminution of value. *White River Dev. Co. v. Meco Sys.,* 806 S.W.2d 735, 741 (Mo. Ct. App. 1991); *Kelley v. Widener Concrete Const.*, 401 S.W.3d 531, 540-41 (Mo. Ct. App. 2013). Although generally the measure of damages is the cost of correcting the defect, an owner may not recover the cost of reconstruction if doing so would involve the destruction of usable property. *White River Dev. Co.*, 806 S.W.2d at 741; *see also Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 527 (Mo. Ct. App. 1998) ("The repair or replacement of the defective property is economic waste if the cost of repair or replacement is disproportionate to the diminution in the value of the property.").

- 22 -

Where reconstruction would involve unreasonable economic waste (destruction of usable property), the owner's damages are calculated based on the difference between the value of the property with the defective work and what its value would have been if it had been constructed according to the terms of the contract. *White River Dev. Co.*, 806 S.W.2d at 741. It is for the Court to determine in construction defect cases which measure of damages is appropriate—cost to repair/replace or the diminution in value. *Bus. Men's Assur. Co. of Am. v. Graham*, 891 S.W.2d 438, 449 (Mo. Ct. App. 1994) (citing *De Long v. Broadston*, 272 S.W.2d 493, 497 (Mo. Ct. App.1954)); *Kelley*, 401 S.W.3d at 540-43 (finding the trial court did not err in applying diminution in value as the measure of damages where concrete contractor defectively poured driveway but the cost to remove and replace the driveway far exceeded the decrease in the home's value).

The only evidence in this case concerning any diminution in value comes from Defendants' own valuation expert who opined that there is no diminution in value for the typical buyer and that even if you look at an atypical buyer willing to pay a premium for the added strength, the diminution in value, if Plaintiffs are able to prove that the concrete contained less Helix than requested and if the decrease in the amount of Helix had a material impact on the strength of Pensmore, would be at most 1%-2% of the fair market value of the house (estimated to be about $81,000 to $162,000). SOF 40. As a result, it is undisputed that the cost to reconstruct Pensmore (estimated by David Paris at $16-$18 million) is significantly disproportionate to any diminution in the value of Pensmore. Plaintiffs have admitted that Pensmore, even with the alleged nonconforming concrete, is habitable, satisfies Plaintiffs' efficiency and sustainability goals and is stronger than most structures built. SOF 16-18, 27-29,

- 23 -

34.[7] Given the myriad of uses for Pensmore,[8] even if Plaintiffs' allegations of a Helix "shortage" are true (although Defendants strongly believe that the evidence at trial will show that such allegations are in fact not true), tearing down the structure and rebuilding it would amount to unreasonable economic waste.[9]

Because they are not entitled to the cost to rebuild Pensmore, it appears that Plaintiffs are attempting to indirectly recover such costs by seeking specific performance. SOF 46. Specific performance, by its definition, only requires a defendant to perform its contractual obligation. *See* SPECIFIC PERFORMANCE, Black's Law Dictionary (10th ed. 2014) ("The rendering, as nearly as practicable, of a promised performance through a judgment or decree; specif., a court-ordered remedy that requires precise fulfillment of a legal or contractual obligation when monetary damages are inappropriate or inadequate, as when the sale of real estate or a rare article

---

[7] In fact, Plaintiffs admit that, even without any Helix at all, Pensmore would still be "a robust structure." SOF 34. Mr. Huff and others have been staying in a portion of Pensmore for years. SOF 30. Mr. Huff also acknowledged that the current structure can be completed without being torn down and that that he would be able to live in the entire structure (main house and guest wing) upon completion. SOF 19. Further, Mr. Huff testified he has already hosted events in Pensmore and, once the rest of the building is completed, any shortage of Helix in the construction of the building will not prevent him from hosting events in the rest of the building. SOF 33. Plaintiffs also admit that even though they are not subject to any building codes, Pensmore, as Plaintiffs allege it was built, complies with all normally applicable building codes. SOF 17. In fact, Plaintiffs admit that even if the building did not contain any Helix at all, because it was constructed also using conventional rebar, it would still comply with normally applicable building codes. SOF 34.

[8] Although Pensmore was designed and built to be a second family home for Steve Huff and his family, Mr. Huff testified that he wanted Pensmore also to act as a type of laboratory in which he and others could spend time and perform experiments or work on projects. SOF 35. Because the building is unfinished, Pensmore only has been used a limited amount for this purpose, but Plaintiffs admit that the structure, once completed, and even without being rebuilt, could still be used for experiments, such as on the thermal aspects of the building. SOFs 36-37.

[9] The fact that Pensmore does not need to be torn down and rebuilt is further evidenced by the fact that Plaintiffs still use Pensmore and are continuing to do work on Pensmore. SOFs 38-39, 47.

is involved"); *see also* 81 C.J.S. *Specific Performance* § 2, at 701-02 (1977) (defining specific performance as "an equitable remedy which compels the performance of a *contract* " and noting that specific performance "compel[s] the parties to do the very things they have *agreed* to do") (emphasis added).

City Wide only provided the concrete to be used in the construction of Pensmore. SOF 6. It did not place or pour the concrete and was not involved in any other way in the construction of the structure. SOF 6-7. As a result, even if Plaintiffs could prove that City Wide breached a duty to one of the Plaintiffs and even if the Court would determine that specific performance is appropriate in this case, such relief would only require City Wide to comply with its alleged contractual obligation—to supply concrete containing the Helix dosage requested. It would not require Defendants to "rebuild" Pensmore because Defendants were never contractually required to build Pensmore in the first place.

### 2. "Lost Opportunity" Damages.

Plaintiffs seek over $13 million in "lost opportunity damages" based on the lost profits Plaintiffs claim they could have earned on the $16 million used to construct Pensmore. SOF 43. In other words, Plaintiffs are claiming that if Pensmore hadn't been built when it was, the funds used to build Pensmore could have been invested and earned a profit. Such alleged damages are not a loss caused by the concrete's alleged failure to conform (such as if Plaintiffs were claiming that Pensmore with the alleged nonconforming concrete can't produce as much profit as Pensmore with conforming concrete could have or if Plaintiffs were claiming that Pensmore was to be used for profit and they will lose that profit if Pensmore needs to be torn down (which, as discussed, it does not need to be torn down)). In fact, Plaintiffs never intended to use Pensmore

CORE/0053865.0033/130447494.28

to generate income or for profit. SOF 32. As a result, such damages are not recoverable under the UCC.

Even if the "lost opportunity" damages sought by Plaintiffs satisfied the definition of consequential damages under the UCC, Plaintiffs' alleged lost opportunity damages are too speculative to be recoverable. In Missouri, "[t]o obtain damage award for lost profits, plaintiff must produce evidence which provides an adequate basis for estimating lost profits with reasonable certainty; proof of actual facts which present a basis for rational estimate of damages without resorting to speculation is required, and the amount of estimated loss of profits should be supported by best evidence available." *Wisch & Vaughan Const. Co. v. Melrose Props. Corp.*, 21 S.W.3d 36, 42 (Mo. Ct. App. 2000). To get to Plaintiffs' $13 million plus in "lost opportunity" damages, one must assume that Plaintiffs would have invested the $16 million even though the undisputed evidence is that the funds used for the construction of Pensmore came from cash and continued to be held as cash until needed for construction. SOF 48-49. One also must assume that Plaintiffs would obtain the rate of return assumed by Plaintiffs even though neither Plaintiff ever directly participated in the alternative investments used by Mr. Paris to calculate his hypothetical rate of return and even though Pensmore, LLC's only "investment" has been a cash account with a minimal rate of return. SOFs 49-50. In fact, at least some of the alternative investments used by Mr. Paris to reach his hypothetical rate of return were not even available for investment by Plaintiffs during a portion of the time at issue. SOF 51-52.

As a result, because Plaintiffs' alleged "lost opportunity" damages are not consequential damages under Missouri's UCC and because the damages are impermissibly speculative, Plaintiffs are not entitled, as a matter of law, to such damages through their breach of contract/breach of warranty claims.

- 26 -

### 3. Such Damages Are Not Recoverable Through Plaintiffs' Fraud Claim.

Under the Missouri UCC, even when a party can avoid the economic loss doctrine (*see infa* Section IV.C), remedies for material misrepresentation or fraud are the remedies available under the Missouri UCC for non-fraudulent breach of contract/warranty. Mo. Rev. Stat. § 400.2-721. As the Official Comment to Mo. Rev. Stat. §400.2-721 explains, the purpose of the section was, "[t]o correct the situation by which remedies for fraud have been more circumscribed than the more modern and mercantile remedies for breach of warranty. Thus the remedies for fraud are extended by this section to coincide in scope with those for non-fraudulent breach." Because Plaintiffs cannot recover the cost to rebuild Pensmore or the "lost opportunity" damages through their non-fraudulent contractual claims, they cannot, as a matter of law, recover such damages through their fraud claim.

### E. Huff Family LLC's Claims Fail As A Matter Of Law.

Pensmore, LLC is the owner of Pensmore. SOF 2. Although the invoices and batch tickets relating to the concrete supplied by City Wide for the construction of Pensmore show Huff Construction as the buyer (SOF 8), even if it is assumed for purpose of this Motion that Pensmore, LLC, as the owner of Pensmore, was either a party to the agreement or otherwise has standing to sue for breach of warranty, Pensmore, LLC's ownership of Pensmore does not provide Huff Family LLC with standing to sue.

Although Plaintiffs claim that Pensmore, LLC is a wholly-owned subsidiary of Huff Family LLC, Pensmore, LLC's claims must be brought in its name, not Huff Family LLC's name. *Allstate Indem. Co. v. Rice*, No. 4:12-CV-00178-BCW, 2013 WL 1314195, at *2 (W.D. Mo. Mar. 28, 2013), aff'd, 755 F.3d 621 (8th Cir. 2014) ("Two separately incorporated companies are separate and distinct legal entities."); *United States v. Eleven Million Seventy-One*

- 27 -

*Thousand One Hundred & Eighty-Eight Dollars & Sixty-Four Cents in U.S. Currency*, No. 4:12-CV-1559 CEJ, 2015 WL 630291, at *4 (E.D. Mo. Feb. 13, 2015) ("Directors, officers and shareholders of a corporation do not have standing to claim an ownership interest in corporate property in their individual capacities; they must state such a claim in the corporate name."). This is true even when an individual is the sole member of an LLC. *See Turner v. Andrew*, 413 S.W.3d 272, 276 (Ky. 2013) (holding "[t]he LLC and its solitary member [] are not legally interchangeable. Moreover, an LLC is not a legal coat that one slips on to protect the owner from liability but then discards or ignores altogether when it is time to pursue a damage claim. The law pertaining to limited liability companies simply does not work that way.").

Likewise, standing is not conferred on another entity that is under similar control. For example in *Clarex Ltd. v. Natixis Securities America LLC*, No. 12 CIV. 0722 PAE, 2012 WL 4849146, (S.D.N.Y. Oct. 12, 2012), Plaintiffs claimed that because several companies were owned and managed by the same bank for the benefit of the same client that they should be granted standing. The court rejected that notion, holding "[t]hat argument is wrong as a basis to establish standing. Corporate form matters. Here, there were distinct legal entities, whose separate nature cannot simply be ignored when inconvenient. It is black-letter law that one corporation cannot assert an affiliate's legal rights." *Id.* at *6.

Separate entities "rise and fall on their own claims," and Missouri law does not recognize a "collective" corporate identity. *Renaissance Leasing,* 322 S.W.3d at 120. Pensmore, LLC is the owner of Pensmore (SOF 2), and Huff Construction, Inc. purchased the Helix to be used in Pensmore, LLC's Pensmore (SOF 9). As a result, Huff Family LLC cannot demonstrate that any of its property was converted, that it suffered any detrimental reliance on any alleged promise made by the Defendants, that any alleged enrichment experienced by Defendants was at its

- 28 -

expense, that any contractual duties to it were breached or that it was injured by any alleged misrepresentations. *Garner v. Barton*, No. 4:14-CV-200-CEJ, 2015 WL 1120085, at *5 (E.D. Mo. Mar. 12, 2015) (requiring ownership of the property for conversion); *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (requiring detrimental reliance for promissory estoppel); *Ariel Preferred Retail Grp., LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 821 (E.D. Mo. 2012) (requiring that a benefit be conferred on defendant by the plaintiff for unjust enrichment); *Arthur v. Medtronic, Inc.*, 123 F. Supp. 3d 1145, 1149 (E.D. Mo. 2015) (requiring that the fraudulent representation injured the plaintiff).

Whether because it lacks standing or because it lacks evidence to prove essential elements of the claims asserted, Huff Family LLC's claims fail as a matter of law.

## V.   CONCLUSION

For the reasons stated herein, Defendants are entitled to summary judgment that (1) Plaintiffs' breach of contract claim is time-barred, in whole or in part, (2) Plaintiffs' fraud claim is barred by the economic loss doctrine, (3) Plaintiffs' good faith and fair dealing "claim" is barred to the extent their breach of contract claim is barred, (4) Plaintiffs cannot recover "cost to rebuild" damages because they are not permitted under the UCC and would amount to economic waste, (5) Plaintiffs cannot recover "lost opportunity" damages because they are not permitted under the UCC and are impermissibly speculative, and (6) Huff Family LLC lacks standing or is unable to prove, as a matter of law, essential elements of all of its claims.

CORE/0053865.0033/130447494.28

Dated: February 22, 2017

Respectfully Submitted,

*Angela G. Nichols*
Angela G. Nichols     MO Bar # 56870
Ashley E. Dillon      MO Bar # 65877
Colby B. Nelson       MO Bar # 66982
STINSON LEONARD STREET LLP
1201 Walnut, Suite 2800
Kansas City, Missouri 64106
Tel:    (816) 842-8600
Fax:    (816) 691-3495
angela.nichols@stinson.com
ashley.dillon@stinson.com
colby.nelson@stinson.com
ATTORNEYS FOR DEFENDANTS

CORE/0053865.0033/130447494.28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of February, 2017, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Western District of Missouri, with notice of same being electronically served by the Court, addressed to:

Bryan O. Wade
Ginger K. Gooch
Husch Blackwell LLP
901 St. Louis Street
Suite 1800
Springfield, MO 65806
Tel: (417) 268-4000
Fax: (417) 268-4040
bryan.wade@huschblackwell.com
ginger.gooch@huschblackwell.com

Gabriel Berg
Lana Milojevic
Kennedy Berg LLP
401 Broadway – Suite 1900
New York, NY 10013
Tel: (212) 899-3400
gberg@kennedyberg.com
lmilojevic@kennedyberg.com

ATTORNEYS FOR PLAINTIFF

_Angela G. Nichols_
Attorney for Defendants

CORE/0053865.0033/130447494.28