IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN T. HUFF FAMILY, LLC, and PENSMORE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No.6:15-cv-03214-BP |
| v. | ) ) ) | |
| THE MONARCH CEMENT COMPANY and CITY WIDE CONSTRUCTION PRODUCTS CO., | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
DEFENDANT THE CITY WIDE CONSTRUCTION PRODUCTS CO.'s
<u>MOTION FOR SUMMARY JUDGMENT</u>
(Oral Argument Requested)**

KENNEDY BERG LLP
Gabriel Berg NY Fed. Bar #: 4148
Lana Milojevic (NY #5080866)
*Pro Hac Vice*
401 Broadway – Suite 1900
New York, NY 10013
Telephone: (212) 899-3400
gberg@kennedyberg.com

HUSCH BLACKWELL LLP
Bryan O. Wade, #41939 (MO)
Ginger K. Gooch, #50302 (MO)
901 E. St. Louis Street, Suite 1800
Springfield, Missouri 65806
Telephone: (417) 268-4000
Facsimile: (417) 268-4040
Bryan.wade@huschblackwell.com
Ginger.gooch@huschblackwell.com

***Attorneys for Plaintiffs Steven T. Huff
Family, LLC, and Pensmore, LLC***

Case 6:15-cv-03214-BP   Document 171   Filed 03/15/17   Page 1 of 47

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

I. INTRODUCTION ................................................................ 1

II. MATERIAL FACTS AS TO WHICH A GENUINE ISSUE EXISTS ......................... 2

III. ARGUMENT ...................................................................22

    A. Whether the UCC Applies is a Question of Fact ...................................22

    B. Plaintiffs' Claims are Timely and Huff Family LLC has Standing ....................26

    C. The Economic Loss Doctrine Does Not Bar Pensmore's Fraud Claim ..............30

    D. Defendants' Damages Arguments are Improperly Raised on Summary Judgment ........................................................................32

        1. Pensmore is Unique ................................................33

        2. Plaintiffs are Entitled to Cost to Rebuild Pensmore Damages for Fraud........................................................34

        3. The Cost to Repair Pensmore .................................34

        4. Plaintiffs Can Recover Lost Opportunity Damages................................38

IV. CONCLUSION ...................................................................40

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AKA Distributing Co. v. Whirlpool Corp.*,
137 F.3d 1083 (8th Cir. 1998) ........................................................ 30

*Allstate Indem. Co. v Rice*,
2013 WL 1314195 (W.D. Mo. Mar. 28, 2013) ................................... 28

*Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*,
155 S.W.3d 50 (Mo. 2005) ............................................................ 39

*Bus. Men's Assur. Co. of Am. v. Graham*,
891 S.W.2d 438 (Mo. Ct. App. 1994) ......................................... 33, 35

*Business Men's Assur. Co. of America v. Graham*,
984 S.W.2d 501 (Mo. 1999) .......................................................... 26

*Clinton v. New York*,
524 U.S. 417 (1998) ..................................................................... 28

*Cty. Asphalt Paving Co. v. 1861 Grp., Ltd.*,
908 S.W.2d 184 (Mo. Ct. App. 1995) .............................................. 38

*Davis v. Cleary Building Corp.*,
143 S.W.3d 659 (Mo. Ct. App. 2004) ................................. 31, 32, 34, 40

*Elkhart Metal Fabricating, Inc. v. Martin*,
No. 14-CV-00705, 2014 WL 2972709 (E.D. Mo. July 1, 2014) ............ 32

*ESPJ Const. Corp. v. Shiavone*,
2008 WL 2663703 (N.J. App. Div. 2008) ......................................... 24

*Foam-Tex Indus., Inc. v. Relaxaway Corp.*,
358 F. Supp. 8 (E.D. Mo. 1973) ..................................................... 33

*Freeman v. Shannon Constr., Inc.*,
560 S.W.2d 732 (Tex. Ct. App. 1977) .............................................. 24

*Hanes v. Twin Gable Farm, Inc.*,
714 S.W.2d 667, 670 (Mo. Ct. App. 1986) ....................................... 40

*Harford Mut. Ins. Co. v. Seibels, Bruce and Co.*,
579 F.Supp. 135 (D. Md. 1984) ..................................................... 25

*Havens Steel Co.*,
317 B.R. 75 (Bankr. W.D. Mo. 2004) .............................................. 34

*Jones v. Galaxy 1 Mktg., Inc.*,
   478 S.W.3d 556 (Mo. Ct. App. 2015)...................................................................... 22

*Kelley v. Widener Concrete Const., LLC*,
   401 S.W.3d 531 (Mo. Ct. App. 2013)............................................................... 33, 35

*Ken Cucchi Const., Inc. v. O'Keefe*,
   973 S.W.2d 520 (Mo. Ct. App. 1998)............................................................... 33, 35

*Kincaid Enterprises, Inc., v. Porter*,
   812 S.W.2d 892 (Mo.App. W.D. 1991).................................................................... 32

*Kruger v. Subaru of Am., Inc.*,
   996 F. Supp. 451 (E.D. Pa. 1998) ........................................................................... 33

*Kyweriga v. Muenchow*,
   1993 WL 355831 (Minn. Ct. App. 1993) ................................................................ 24

*Lerner v. Yeghishian*,
   271 S.W.2d 588 (Mo. Ct. App. 1954)...................................................................... 33

*LeSueur Creamery, Inc. v. Haskon, Inc.*,
   660 F.2d 342 (8th Cir. 1981) ................................................................................... 25

*Linn Reorganized School Dist. No. 2 of Osage Cnty. v. Butler Mfg. Co.*,
   672 S.W.2d 340 (Mo. 1984) .............................................................................. 27, 28

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................................. 28

*Maryland Supreme Corp. v. Blake Co.*,
   369 A.2d 1017 (1977) .............................................................................................. 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................ 25

*Miller v. Stan Ortmeier Const. Co.*,
   426 N.W.2d 272 (Neb. 1988)................................................................................... 33

*Mo. Farmers Ass'n v. McBee*,
   787 S.W.2d 756 (Mo. Ct. App. 1990)................................................................. 22, 25

*Multivac, Inc. v Rotella's Italian Bakery, Inc.*,
   14-1003-CV-W-ODS, 2016 WL 1030150 (W.D. Mo. Mar. 10, 2016) ................... 25

*Nestlé Purina Petcare Company v. Blue Buffalo Company Ltd.*,
   181 F.Supp.3d 618 (E.D. Mo. 2016) ....................................................................... 30

*O'Shea v. Littleton*,

414 U.S. 488 (1974) ........................................................................................................ 28

*Parshall v. Buetzer,*
195 S.W.3d 515 (Mo. Ct. App. 2006) ............................................................................ 39

*Prince v. Spire Corp.*,
584 S.W.2d 108 (Mo. Ct. App. 1979) ............................................................................ 24

*R.W. Murray Co. v. Shatterproof Glass Corp.*,
758 F.2d 266 (8th Cir. 1985) .......................................................................................... 27

*Rogers v. Superior Metal, Inc.,*
480 S.W.3d 480 (Mo. Ct. App. 2016) ............................................................................ 35

*Rotella v. Joseph,*
615 S.W.2d 616 (Mo. App. 1981) ................................................................................... 29

*RPC Elec., Inc. v. Wintronics, Inc.,*
2012 WL 986484 (Ohio Ct. App. 2012) ......................................................................... 25

*Rust & Martin, Inc. v. Ashby*,
671 S.W.2d 4 (Mo. Ct. App. 1984) ............................................................................ 36, 37

*Shelly Materials v. Great Lakes Crushing*,
No. 2013-Ohio-5654, 2013 WL 6810660 (Ohio Ct. App. Dec. 23, 2013) ...................... 25

*Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.*,
817 S.W.2d 530 (Mo. Ct. App.1991) ............................................................................. 39

*Stewart v Rise, Inc.,*
791 F.3d 849, 861 (8th Cir 2015) .................................................................................... 23

*Stolzenburg v. Biewer Lumber, LLC,*
2016 WL 3582032 (E.D. Mo. 2016) ............................................................................... 26

*Stom v. St. Clair Corp.,*
153 S.W.3d 360, 365 (Mo. Ct. App. 2005) ..................................................................... 35

*Trademark Medical, LLC v. Birchwood Laboratories, Inc.*,
22 F.Supp.3d 998 (E.D. Mo. 2014) ................................................................................. 30

*Tyler v. Harper*,
744 F.2d 653 (8th Cir. 1984) .......................................................................................... 25

*United States v Eleven Million Seventy–One Thousand One Hundred and Eighty–Eight Dollars
and Sixty–Four Cents ($11,071,188.64) in United States Currency,*
825 F.3d 365 (8th Cir 2016) ........................................................................................... 28

*Web Innovations & Technology Svcs., Inc. v. Bridges to Digital Excellence, Inc.*,

    69 F.Supp.3d 928 (E.D. Mo. 2014) ............................................................................ 30

*White River Dev. Co. v. Meco Sys.*,
    806 S.W.2d 735 (Mo. Ct. App. 1991) .............................................................. 33, 35

*Williams Const., Inc. v. Wehr Const., L.L.C.*,
    403 S.W.3d 660 (Mo. Ct. App. 2012) .................................................................. 39

*Wisch & Vaughan Const. Co. v. Melrose Props. Corp.*,
    21 S.W.3d 36 (Mo. Ct. App. 2000) ..................................................................... 33

## Statutes

Mo. Ann. Stat. § 400.2-716 ........................................................................................ 34

Mo. Rev. Stat. § 400.2-102 ......................................................................................... 22

Mo. Rev. Stat. § 516.120 ............................................................................................ 26

## Other Authorities

6 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 1501 ................... 29

# I.     INTRODUCTION

Discovery has proven defendants' Helix shorting scam.  James Aubuschon, defendants' employee responsible for mixing Helix into the Pensmore concrete, testified that the Helix shorting scam occurred.  Mr. Aubuschon testified that the scam was ordered by his boss, Don Shuler, who was terminated from defendants' companies in 2013 for dishonesty.  Mr. Aubuschon's credibility, conversely, is beyond reproach.  While offering a tepid denial of the scam, littered with inconsistencies, Mr. Shuler admitted that Mr. Aubuschon has "no motive" to make up the shorting scam.

The evidence also establishes that forty out of fifty-two of the core samples taken out of Pensmore and tested by defendants' experts have less than the expected dosages of Helix in them.  Instead of confronting reality and accepting responsibility for their actions, defendants have hired a team of seven experts who act as advocates, compromising their independence.  Each expert substitutes his opinion for the ultimate questions in this case, cavalierly invading the province of the jury.

Defendants' motion for summary judgment fails because it resolves numerous questions of fact in its own favor, especially the one that permeates their entire motion:  whether the UCC applies to this case at all.  Separately, defendants do not argue that plaintiffs are entitled to "no damages."  Instead, defendants improperly attempt to narrow plaintiffs' damages on a motion for summary judgment; yet, they rely on cases in which damages arguments were made at trial, compelling denying of their motion.  Last, defendants' motion must be denied because it ignores the robust record of documentary evidence and numerous factual admissions made on cross examination by defendants' witnesses.

1

## II.    MATERIAL FACTS AS TO WHICH A GENUINE ISSUE EXISTS

1.      Steven T. Huff Family, LLC, ("HF") and Pensmore, LLC, (Collectively, "Plaintiffs") admit that that they asserted claims against City Wide Construction Products Co. ("City Wide") for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel in the alternative, conversion and unjust enrichment, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 1.

2.      Plaintiffs admit that Pensmore LLC directly owned Pensmore, as claimed in City Wide's Statement of Uncontroverted Material Facts No. 2; but, deny that Pensmore LLC is the ultimate owner of the land and structure.  Pensmore LLC did not fund the construction of Pensmore -- HF paid to construct Pensmore (through its paymaster and agent Huff Construction Inc.).  Deposition Transcript of Steven Huff (hereafter "Huff Tr.") at 10-11, 17-19, 23-25, attached as Berg Decl. Ex. 1. In addition, Pensmore LLC does not observe any corporate formalities: it has no employees, no business plans, no income statements, no annual reports and no cash flow statements.  Huff Tr. at 38-39, attached as Berg Decl. Ex. 1.  Pensmore, LLC is a "disregarded" entity for tax purposes and is dominated and controlled by Steven Huff.  Huff Tr. at 44, attached as Berg Decl. Ex. 1.

3.      Plaintiffs admit that they allege in their Complaint the general allegations in City Wide's Statement of Uncontroverted Material Facts No. 3; but, on summary judgment evidence supplants allegations in a Complaint. Discovery has proven, among other things, that: (1) the whistleblower, James Aubuschon, has admitted to the existence of a deliberate Helix shorting scam by defendants in the construction of Pensmore (Affidavit of James Aubuschon ("Aubuschon Aff.) at ¶ 8-18, attached Berg Decl. Ex. 2); (2) Don Shuler offered a general denial of the shorting scam, yet he admits that Mr. Aubuschon has "no motive" make up the shorting scam (Deposition Transcript of Don Shuler (hereafter "Shuler Tr.") at 182:6-23, attached as Berg Decl. Ex. 3); (3) Mr. Shuler was

terminated from defendants' companies for dishonesty (Deposition of Walter Wulf (hereafter "Wulf Tr.") at 64:5-8, attached as Berg Decl. Ex. 4); (4) Mr. Shuler misled plaintiffs' foreman, Jerry Spude, into believing that he was a structural engineer, when in fact, Mr. Shuler was Head of Sales (Deposition Transcript of Gerald Spude (hereafter "Spude Tr.") at 122:, attached as Berg Decl. Ex. 5); (5) defendants' representatives knew how much Helix was required to be mixed prior to each pour (Aubuschon Aff. at ¶ 9-12, attached as Berg Decl. Ex. 2; Email dated 8/24/2011 from Shuler to Spude, previously used at Shuler Deposition Ex. 4, attached hereto as Berg Decl. Ex. 6; Email dated 8/25/2011 from Spude to Shuler previously used as Shuler Deposition Ex. 5, attached hereto as Berg Decl. Ex. 7); (6) Plaintiffs purchased all of the Helix used at Pensmore and stored it at City Wide (Shuler Tr. at. 45, attached as Berg Decl. Ex. 3; Aubuschon Aff. at ¶ 9, attached as Berg Decl. Ex. 2; Deposition of Dennis McCann (hereafter "McCann Tr.") at 80-81, attached as Berg Decl. Ex. 8; Email dated 9/28/2009 from Shuler to Huff previously used as Shuler Deposition Ex. 1, attached hereto as Berg Decl. Ex. 9); (7) Monarch's CFO, Deborah Roe, used her position at Monarch to arrange a tour of Pensmore and has plaintiffs' Helix in her own home (Deposition Transcript of Debra Roe ("Roe Tr.") at 15-18, attached as Berg Decl. Ex. 10); (8) 40 of defendants' 52 core samples, tested by the CTL Group, have less than the expected amount of Helix in them, as is consistent with plaintiffs' core test results from Element Technologies (CTL Group Report at pg. 32, highlighted by Dennis McCann, attached as Berg Decl. Ex. 11; Elements Testing Report, attached as Berg Decl. Ex. 12); (9) one to two boxes of Helix were shorted on most pours at Pensmore (Luke Pinkerton July 25, 2016 Affidavit, attached as Berg Decl. Ex. 31); (10) defendants' technical expert admits that defendants' core test results are consistent with plaintiffs' core test results (McCann Tr. at 131-32, attached as Berg Decl. Ex. 8); and (11) cores tested from the west tunnel wall have been proven to have no Helix in them whatsoever (Elements Supplemental Testing Report, attached as Berg Decl. Ex. 13), which defendants'

expert described as "strong evidence," that he would need to consider in this matter (McCann Tr. at 22, attached as Berg Decl. Ex. 11).

4.      Plaintiffs admit that they allege in their Complaint the general allegations in City Wide's Statement of Uncontroverted Material Facts No. 4; but, on summary judgment evidence supplants allegations in a Complaint.  Discovery has proven, among other things, that: (1) the whistleblower, James Aubuschon, has admitted to the existence of a deliberate Helix shorting scam by defendants in the construction of Pensmore (Affidavit of James Aubuschon ("Aubuschon Aff.) at ¶ 8-18, attached Berg Decl. Ex 2); (2) Don Shuler offered a general denial of the shorting scam, yet he admits that Mr. Aubuschon has "no motive" make up the shorting scam (Deposition Transcript of Don Shuler (hereafter "Shuler Tr.") at 182, attached as Berg Decl. Ex. 3), was terminated from defendants' companies for dishonesty (Deposition of Walter Wulf (hereafter "Wulf Tr.") at 64, attached as Berg Decl. Ex. 4) (3) Mr. Shuler and plaintiffs' foreman, Jerry Spude, into believing that he was a structural engineer, when in fact, Mr. Shuler was Head of Sales (Deposition Transcript of Jerry Spude (hereafter "Spude Tr.") at 212, attached as Berg Decl. Ex. 5); (4) defendants' representatives knew how much Helix was required to be mixed prior to each pour (Aubuschon Aff. at ¶ 9-12, attached as Berg Decl. Ex. 2; Email dated 8/24/2011 from Shuler to Spude, previously used at Shuler Deposition Ex. 4, attached hereto as Berg Decl. Ex. 6; Email dated 8/25/2011 from Spude to Shuler previously used as Shuler Deposition Ex. 5, attached hereto as Berg Decl. Ex. 7); (5) Plaintiffs purchased all of the Helix used at Pensmore and stored it at City Wide (Shuler Tr. at. 45, attached as Berg Decl. Ex.3; Aubuschon Aff. at ¶ 9, attached as Berg Decl. Ex. 2; Deposition of Dennis McCann (hereafter "McCann Tr.") at 80-81, attached as Berg Decl. Ex. 8; Email dated 9/28/2009 from Shuler to Huff previously used as Shuler Deposition Ex. 1, attached hereto as Berg Decl. Ex. 9); (6) Monarch's CFO, Deborah Roe, used her position at Monarch to arrange a tour of Pensmore and has plaintiffs' Helix in her own home

4

(Deposition Transcript of Debra Roe ("Roe Tr.") at 15-18, attached as Berg Decl. Ex. 10); (7) 40 of defendants' 52 core samples, tested by the CTL Group, have less than the expected amount of Helix in them, as is consistent with plaintiffs' core test results from Element Technologies (CTL Group Report at pg. 32, attached as Berg Decl. Ex. 11; Elements Testing Report, attached as Berg Decl. Ex. 12); (8) one to two boxes of Helix were shorted on most pours at Pensmore (Luke Pinkerton July 25, 2016 Affidavit, attached as Berg Decl. Ex. 31); (9) defendants' technical expert admits that defendants' core test results are consistent with plaintiffs' core test results (McCann Tr. at 131-32, attached as Berg Decl. Ex. 8); and (10) cores tested from the west tunnel wall have been proven to have no Helix in them whatsoever (Elements Supplemental Testing Report, attached as Berg Decl. Ex. 13), which defendants' expert described as "strong evidence," that he would need to consider in this matter (McCann Tr. at 22, attached as Berg Decl. Ex. 8).

5. Plaintiffs admit that they allege in their Complaint the general allegations in City Wide's Statement of Uncontroverted Material Facts No. 5; but, on summary judgment evidence supplants allegations in a Complaint. Discovery has proven that: (1) dates of the pours by defendants occurred on the dates, as pled (HUFF007103, attached as Berg Decl. Ex. 14; CTL Group Expert Report at 36, attached as Berg Decl. Ex. 15); (2) defendants falsely assured plaintiffs that the proper amount of Helix was being mixed into the concrete used to construct Pensmore (Aubuschon Aff. at ¶ 14, attached as Berg Decl. Ex. 2). They did so, in part, because they feared that they would lose the Pensmore contract (Aubuschon Tr. at 20-24, attached as Berg Decl. Ex. 16; Shuler Tr. at 17-18, attached as Berg Decl. Ex. 3); (3) the amount of plasticizer that was to be used at Pensmore was often not added to the concrete (Aubuschon Tr. at 32-36, attached as Berg Decl. Ex. 16); (4) defendants' salesman Larry Cotter claimed that he would add plasticizer to the concrete mix at the Pensmore site (Deposition Transcript of Larry Cotter ("Cotter Tr.") at 20-21, 23, attached as Berg Decl. Ex. 17;

Aubuschon Tr. at 34-35, attached as Berg Decl. Ex. 16), while Don Shuler that he was the one who added plasticizer to the Pensmore concrete; and (5) the amount of plasticizer billed to HF for Pensmore through their paymaster Huff Construction Inc. was always constant (Shuler Tr. at 24, attached as Berg Decl. Ex. 3; D0000093 previously used as Shuler Deposition Ex. 3, attached hereto as Berg Decl. Ex. 18), yet defendants claimed to have used their judgment in "eyeballing" the quantity of plasticizer to be added (Cotter Tr. at 23, attached as Berg Decl. Ex. 17). See also, Disputed Material Fact No. 4.

      6.    Plaintiff denies the assertions in City Wide's Statement of Uncontroverted Material Facts No. 6. Testimony from defendants' own witnesses establishes that: (1) Monarch supplied the cement that became the hardened concrete used to construct Pensmore (Wulf Tr. at 15, attached as Berg Decl. Ex. 4; Shuler Tr. at 178, attached as Berg Decl. Ex. 3; Roe Tr. at 64-65, attached as Berg Decl. Ex. 10); and (2) from October 2009 through November 2012, City Wide poured the Helix-mixed concrete at Pensmore (HUFF007103, attached as Berg Decl. Ex. 14; CTL Group Expert Report at 36, attached as Berg Decl. Ex. 15). Every relevant witness in this case confirms that City Wide poured concrete for Pensmore (Shuler Tr. at 30, 182-183, attached as Berg Decl. Ex. 3; Aubuschon Tr. at 47-48, attached as Berg Decl. Ex. 16; Spude Tr. at 46, attached as Berg Decl. Ex. 5; Huff Tr. at 164, attached as Berg Decl. Ex. 1; Deposition Transcript of Joe Huff at 47, attached as Berg Decl. Ex. 19). In fact, there are thousands of City Wide job tickets reflecting each pour on the Pensmore project. Selection of certain City Wide tickets from different months, marked HCI0003095 – 0003108, attached as Berg Decl. Ex. 20. On this summary judgment record, City Wide submits a self-serving affidavit from David Calhoun, which lacks any foundation establishing his relationship to Pensmore, and is of no evidentiary value. Plaintiffs admit that defendants did not place the concrete at Pensmore, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 6.

7.    Plaintiff denies the assertions in City Wide's Statement of Uncontroverted Material Facts No. 7.  (1) Monarch supplied the cement that became the hardened concrete used to construct Pensmore (Wulf Tr. at 15, attached as Berg Decl. Ex. 4; Shuler Tr. at 178, attached as Berg Decl. Ex. 3; Roe Tr. at 64-65, attached as Berg Decl. Ex. 10); and (2) from October 2009 through November 2012, City Wide poured the Helix-mixed concrete at Pensmore. (HUFF007103, attached as Berg Decl. Ex. 14; CTL Group Expert Report at 36, attached as Berg Decl. Ex. 15).    Helix was the critical technology used to design Pensmore to withstand the strongest wind speeds ever recorded (300 mph). Huff. Tr. at 131, attached as Berg Decl. Ex. 1.  Every witness in this case confirms that City Wide poured concrete for Pensmore (Shuler Tr. at 30, 182-183, attached as Berg Decl. Ex. 3; Aubuschon Tr. at 47-48, attached as Berg Decl. Ex. 16; Spude Tr. at 46, attached as Berg Decl. Ex. 5; Huff Tr. at 164, attached as Berg Decl. Ex. 1; Deposition Transcript of Joe Huff at 47, attached as Berg Decl. Ex. 19). In fact, there are thousands of City Wide job tickets reflecting each pour on the Pensmore project. Selection of certain City Wide tickets from different months, marked HCI0003095 – 0003108, attached as Berg Decl. Ex. 20.    In addition, after learning that defendants' core samples contained lower than the expected amount of Helix in them, defendants' experts set out to explain away those results by performing a test on Helix-mixed concrete to determine if "clumping" could be the cause. CTL Group Expert Report at 18-21, attached as Berg Decl. Ex. 15.  While those tests proved that clumping could not be the cause of the shorting of Helix at Pensmore, defendants' experts concluded that precise measures, such as using a screen, a vibrating mechanism and spreading out the Helix by hand as it is poured out of the box, must be employed to minimize clumping.  CTL Group Expert Report at 45-46, attached as Berg Decl. Ex. 15.  These methods, which are undisputedly construction methods, were employed by defendants in constructing Pensmore.  Aubuschon Tr. at 29-30, 142-144, attached as Berg Decl. Ex. 16; Shuler Tr. at 16-17, 58, attached as Berg Decl. Ex. 3.  Defendants'

technical expert, Dr. Dennis McCann also testified that mixing Helix into cement was a service provided by defendants. McCann Tr. at 80, attached as Berg Decl. Ex. 8.

8.      Plaintiffs admit that Huff Construction, Inc. was funded by Steven T. Huff Family LLC and acted as the paymaster and agent for the Steven T. Huff Family LLC in the construction of Pensmore and was the named customer/buyer on most City Wide batch tickets, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 8; but, deny that accounts receivable were maintained or supplied by City Wide. Monarch issues the invoices for City Wide and all payments on the Pensmore project were consolidated onto the Monarch general ledger. Roe Tr. at 9, attached as Berg Decl. Ex. 10.

9.      Plaintiffs admit that the Helix invoices reflecting the payment by Steven T. Huff Family LLC for the Helix delivered to City Wide and used in Pensmore identify Huff Construction, Inc., which was funded by Steven T. Huff Family LLC and acted as the paymaster and agent for the Steven T. Huff Family LLC, as the Polytorx customer, as indicated in City Wide's Statement of Uncontroverted Material Facts No. 9. It is undisputed that plaintiffs' representatives purchased all of the Helix earmarked for use in the construction of Pensmore. Huff Tr. at 23-24, attached as Berg Decl. Ex. 1; Initial Expert Report of David N. Paris ¶ 5, 23, attached as Berg Decl. Ex. 21.

10.     Plaintiffs admit that they allege in their Complaint the general allegations in City Wide's Statement of Uncontroverted Material Facts No. 10; but, on summary judgment evidence supplants allegations in a Complaint. See Disputed Questions of Fact Nos. 3 and 4. Discovery has demonstrated that not all pours were shorted, especially when plaintiffs' representatives were present. James Aubuschon testified that he stopped shorting boxes of Helix towards the end of his work on the Pensmore project. Aubuschon Tr. at 112-113, attached as Berg Decl. Ex. 16.

8

11.     Plaintiffs admit that defendants and Steven T. Huff Family LLC entered into a tolling agreement with defendants as articulated in City Wide's Statement of Uncontroverted Material Facts No. 11; but, whether the tolling agreement and amendments extend to wholly owned subsidiaries or affiliates is a legal question.

12.     Plaintiffs admit that Steven T. Huff Family LLC initiated this suit on May 23, 2015, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 12.

13.     Plaintiffs admit that Pensmore LLC first asserted claims against defendants on February 2, 2017, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 13.

14.     Plaintiffs admit that defendants' 30(b)(6) Deposition notice to Plaintiffs identified the matters upon which examination was requested, as articulated in Monarch's Statement of Uncontroverted Material Facts No. 14; but deny that Mr. Huff's testimony is the best evidence of a Helix shorting scam that was not known to him until October 2014, and not confirmed until April 2015.   In this case, Mr. Huff is both a corporate designee and a fact witness.   Plaintiffs took appropriate care not to bias Mr. Huff's factual testimony by instructing him to study the testimony of other witnesses in this case.

15.     Plaintiffs admit that the assertions in Monarch's Statement of Uncontroverted Material Facts No. 15 were partial answers given by Mr. Huff, but deny that the answers are complete or the best evidence of a Helix shorting scam that was not known to him until October 2014, and not confirmed until April 2015.   In fact, there is an objection to the question asked about the purpose of constructing Pensmore because it was asked and answered in much more detail, both before and after the isolated answer on page 234 of the transcript cited by defendants.   Huff Tr. at 234, attached as Berg Decl. Ex. 1.   Pensmore was built to serve as a living laboratory to promote the study of science in this

country, to be a durable and green structure that would serve as a showcase to launch the businesses of TF Forming Systems and Polytorx.  Huff Tr. at 229; 238, attached as Berg Decl. Ex. 1.

16.     Plaintiffs admit that Steven Huff in part testified that he thinks Pensmore, as built, is "stronger than most structures," as articulated in City Wide's Statement of Uncontroverted Material Facts No. 16; but deny that the statement is complete.  The complete answer, included in defendants' own citation, was as follows: "I think it's stronger than most structures as built, but it's not as strong as it should have been or would have been." Huff Tr. at 212, attached as Berg Decl. Ex. 1.

17.     Plaintiffs admit that Steven Huff in part testified that Pensmore would meet code as articulated in City Wide's Statement of Uncontroverted Material Facts No. 17; but deny that the statement is a complete one.  The complete answer was: "Yes. As I said several times, it would meet code. I mean, it would still be safer than, you know, a wood frame structure. It just would not be what it's supposed to be." Huff Tr. at 201, attached as Berg Decl. Ex. 1.  In addition, Steven Huff testified that adding Helix was required to achieve design loads, but not to meet code, because Mr. Huff was never concerned about meeting code.  Huff Tr. at 91, 115, attached as Berg Decl. Ex. 1.

18.     Plaintiffs admit that Pensmore, as built, would still be safer than a wood frame structure as articulated in City Wide's Statement of Uncontroverted Material Facts No. 18; but deny that this statement is a complete one.  Mr. Huff's complete answer was: "Yes. As I said several times, it would meet code. I mean, it would still be safer than, you know, a wood frame structure. It just would not be what it's supposed to be." Huff Tr. at 201, attached as Berg Decl. Ex. 1.  In addition, Steven Huff testified that adding Helix was required to achieve design loads, but not to meet code, because Mr. Huff was never concerned about meeting code.  Huff Tr. at 91, 115, attached as Berg Decl. Ex. 1.

19.     Plaintiffs admit that Steven Huff, in part testified that he could live in Pensmore if it were finished, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 19; but

deny that this statement is a complete one. Defendants own citation references Mr. Huff's concern about the roof being torn off by an EF-5 tornado while living at Pensmore. Huff Tr. at 200, attached as Berg Decl. Ex. 1. An analysis performed by Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

20.     Plaintiffs admit that Steven Huff in part testified that the actual design criteria were all in his head and that it was not a typical project in which specifications were formally prepared, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 20; but deny that the statement is a complete one. Seven pages earlier in his transcript, Mr. Huff was much more specific about the "design loads" and "wind loads" that he sought to achieve in constructing Pensmore, testifying, that he was designing "towards 300 miles an hour" because that is the highest velocity winds ever recorded. Huff Tr. at 131, attached as Berg Decl. Ex. 1. Plus, Mr. Huff "wanted to design a structure that was, you know, well able to withstand any kind of debris impact that nature could throw at it with a lot of safety margins and so that's – that was what led me to this design." Huff Tr. at 134, attached as Berg Decl. Ex. 1.

21.     Plaintiffs admit that Steven Huff designed Pensmore, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 21; but, deny that the statement is a complete one. Mr. Huff consulted architects and engineers when necessary. Huff Tr. at 86-87, attached as Berg Decl. Ex. 1.

22. Plaintiffs admit that Steven Huff gave the answer quoted as articulated in City Wide's Statement of Uncontroverted Material Facts No. 22; but, deny that the statement is a complete one. An analysis performed by plaintiffs' expert Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

23. Plaintiffs admit that Steven Huff gave the answer quoted, to the question quoted, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 23; but, deny that the statement is a complete one. An analysis performed by plaintiffs' expert Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

24. Plaintiffs admit that Steven Huff gave the answer quoted, to the question quoted, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 24; but, deny that the statement is a complete one. An analysis performed by plaintiffs' expert Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is

no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

25.     Plaintiffs admit that Steven Huff gave the answer quoted, to the question quoted, as articualted in City Wide's Statement of Uncontroverted Material Facts No. 25; but, deny that the statement is a complete one. An analysis performed by plaintiffs' expert Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

26.     Plaintiffs admit that Steven Huff gave the answer quoted, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 26; but, deny that the statement is a complete one. Omitted from defendants' statement is Mr. Huff's description of damage to windows as "cosmetic." Huff Tr. at 208, attached as Berg Decl. Ex. 1. An analysis performed by plaintiffs' expert Luke Pinkerton in rebutting the CTL Report evaluates the uplift forces of 300mph winds on the Pensmore roof, as opposed to the lateral force of 250mph winds on the Pensmore walls performed by defendants' experts. Rebuttal Affidavit of Expert Luke Pinkerton, attached as Berg Decl. Ex. 22. Mr. Pinkerton concludes if there is no Helix in the roof, as defendants' experts assume, the capacity of the roof to withstand 3.2 million pounds of pressure created by 300 mph winds is reduced by roughly 44%. *Id.*

27.     Plaintiffs admit that Steven Huff testified that he believed Pensmore, as constructed, would be "low-maintenance," as articulated in City Wide's Statement of Uncontroverted Material Facts No. 27; but deny that the statement is a complete one. Defendants omit Mr. Huff's prefatory statement: "Well, it's a little bit hard to say when it's not finished." Huff Tr. at 108-109, attached as

Berg Decl. Ex. 1. Plaintiffs further deny that Mr. Huff testified that Pensmore as built is "highly sustainable." Instead, he said, "If a tornado doesn't take the roof off or something. But from the standpoint of day-to-day operation, absent some extreme event, it is, I think, highly sustainable." Huff Tr. at 111, attached as Berg Decl. Ex. 1. Plaintiffs admit that Pensmore is energy efficient.

28.     Plaintiffs admit that Mr. Huff testified that Pensmore, as built, is a "green" structure, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 28; but deny that the statement is a complete one. Defendants omit that Mr. Huff prefaced his answer with the following: "that's kind of a vague term, 'one of the greenest.'" Huff Tr. at 212, attached as Berg Decl. Ex. 1. Plaintiffs admit that after asserting that the question was vague that Mr. Huff agreed that Pensmore is one of the greenest structures in the world.

29.     Redundant. See Disputed Question of Material Facts No. 16.

30.     Plaintiffs admit that Mr. Huff and others have stayed in the guest wing of Pensmore for "maybe" three years, as imprecisely articulated in City Wide's Statement of Uncontroverted Material Facts No. 30.

31.     Plaintiffs admit that Mr. Huff testified that it would cost "about $3 million" to complete Pensmore, excluding furnishings, as asserted in City Wide's Statement of Uncontroverted Material Facts No. 31. Huff Tr. at 286, attached as Berg Decl. Ex. 1.

32.     Plaintiffs admit that Mr. Huff testified that Pensmore would not be used to generate profits, as articulated by City Wide's Statement of Uncontroverted Material Facts No. 31; but deny that the statement is a complete one. Pensmore was always meant to be used to showcase and market TF Forming Systems and Polytorx. Huff Tr. at 238, attached as Berg Decl. Ex. 1.

33.     Plaintiffs admit some events have been held at Pensmore, despite the shorting scam, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 34; but, deny that the this

statement is a complete. A more comprehensive answer given by Mr. Huff, omitted by defendants, includes the following testimony:

> Well, now I'm in a bit of a hiatus so I'm waiting to see what happens with this lawsuit. I don't know whether -- so there's -- there's things I can't do with it right now because it's not finished. And, you know, I'm kind of in -- in limbo here. Some of it, we -- we've been sponsoring conferences and things and had limited smaller numbers of people and building the part that's finished over in the guest wing. We held a fundraiser for a charity for homeless people down in Branson, but we held it in our big garage because the house isn't finished. So we're working around as we can, but, obviously, we can't use the full structure because it isn't built. And from a marketing point of view, sales marketing point of view, you know, there's a bit of a cloud around things because, again, this lawsuit in terms of this is a sterling example of how to build something with new technologies or is this a big mistake.

Huff Tr. at 198, attached as Berg Decl. Ex. 1.

34.    Plaintiffs admit that Steven Huff gave the answer quoted, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 34; but deny that the answer cited is a complete one. The complete answer was: "Yes. As I said several times, it would meet code. I mean, it would still be safer than, you know, a wood frame structure. It just would not be what it's supposed to be." Huff Tr. at 201, attached as Berg Decl. Ex. 1. In addition, Steven Huff testified that adding Helix was required to achieve design loads, but not to meet code because Mr. Huff was never concerned about meeting code. Huff Tr. at 91, 115, 201, attached as Berg Decl. Ex. 1.

35.    Plaintiffs admit that Steven Huff in part testified that he wanted Pensmore to serve as a laboratory to bring students in to get them interested in science and technology and to give them a place to do experiments, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 35; but deny that this answer is cited completely. Pensmore was built to serve as a living laboratory to promote the study of science in this country, to be a durable and green structure that would serve as a showcase to launch the businesses of TF Forming Systems and Polytorx. Huff Tr. at 229, 238, attached as Berg Decl. Ex. 1.

36.     Plaintiffs admit that Steven Huff testified that he has begun to use Pensmore as a laboratory and that its use is limited because it is not finished, as asserted in City Wide's Statement of Uncontroverted Material Facts No. 36; but, deny that the statement is a complete one.  A more comprehensive answer given by Mr. Huff, omitted by defendants, includes the following testimony:

> Well, now I'm in a bit of a hiatus so I'm waiting to see what happens with this lawsuit. I don't know whether -- so there's -- there's things I can't do with it right now because it's not finished. And, you know, I'm kind of in -- in limbo here.  Some of it, we -- we've been sponsoring conferences and things and had limited smaller numbers of people and building the part that's finished over in the guest wing. We held a fundraiser for a charity for homeless people down in Branson, but we held it in our big garage because the house isn't finished. So we're working around as we can, but, obviously, we can't use the full structure because it isn't built. And from a marketing point of view, sales marketing point of view, you know, there's a bit of a cloud around things because, again, this lawsuit in terms of this is a sterling example of how to build something with new technologies or is this a big mistake.

Huff Tr. at 198, attached as Berg Decl. Ex. 1.

37.     Plaintiffs admit that Steven Huff testified that testing could still be done in a laboratory at Pensmore as asserted in City Wide's Statement of Uncontroverted Material Facts No. 37; but deny that the statement is a complete one.  Mr. Huff's testimony, omitted by defendants in the same answer they cite, was as follows: "but, obviously, we don't want to do any real testing on the structure if we have any reason to suspect it [over-spoken]."   Mr. Huff further testified that he had planned hurl projectiles, including large timbers and railroad ties at high velocities at Pensmore but that he canceled the test because he is not confident that the structure could withstand those tests.  Huff Tr. at 231-232, attached as Berg Decl. Ex. 1.  Plaintiffs admit that Mr. Huff testified that he would not be comfortable performing tests to show the benefit of Helix because the dosages are not known "throughout the structure," but this testimony was prefaced by Mr. Huff's testimony that "anything that was going to stress the structure, I would be reluctant to do."  Huff. Tr. at 233, attached as Berg Decl. Ex. 1.

38.     Plaintiffs admit that Jared Gorham has been asked to perform the work identified in City Wide's Statement of Uncontroverted Material Facts No. 38; but deny that the statement is a

16

complete one. Mr. Huff testified that Mr. Gorham is part of a skeleton crew that has performed work on a slowed down basis, the majority of which revolves around the HVAC system implemented to prevent tax credits from lapsing. Huff. Tr. at 237, attached as Berg Decl. Ex. 1.

39.    Plaintiffs admit that Jonathan Pohlsander has been asked to perform the work identified in City Wide's Statement of Uncontroverted Material Facts No. 39; deny that the statement is a complete one. Mr. Huff testified that Mr. Pohlsander is part of a skeleton crew that has performed work on a slowed down basis, the majority of which revolves around the HVAC system implemented to prevent tax credits from lapsing. Huff. Tr. at 237, attached as Berg Decl. Ex. 1.

40.    Plaintiffs deny that defendants' valuation of Pensmore is reliable, or even credible, expert report. In addition to submitting a rebuttal expert report demonstrating that defendants' appraisal is not credible or methodologically proper, and establishing that the diminution in value analysis is irrelevant to this case because of Pensmroe's uniqueness, plaintiffs challenge defendants' appraisal of Pensmore as unreliable because defendants' appraiser: (1) admits that Pensmore is unique, yet he defines the market for Pensmore to be a garden-variety residential one (Shaner Tr., attached to Berg Dec. as Ex. 26, at 16:7-15; (2) admits that there are no comparable properties to apply to Pensmore, yet he ultimately applies a residential comparable to Pensmore to reduce the value of it (Shaner Tr. at 28:2-4); (3) questioned the validity of his own appraisal (Shaner Tr. at 123:5-124:13); (4) failed to apply the correct methodology, ignoring that he was required to perform a contribution analysis (which determines the value of individual, critical components of a structure) in his diminution in value opinion, and instead the appraiser speculates on a prospective buyer's level of interest in Helix, without any supporting qualitative or quantitative data (Berg Dec. Ex. 24 at 4); (5) failed to define a proper market for Pensmore, especially given that the appraiser admits that Pensmore is so unique that there are no comparable sales against which it can be assessed (Berg Dec. Ex. 24 at

3); (6) limits the defined market to Missouri, ignoring that "given the unique nature of this asset a national marketing campaign, or beyond, would likely be implemented in an attempt to sell this asset; " (Berg Ex. 24 at 2-3) (7) is so subjective that he fails to substantiate a 60% reduction in the value of Pensmore with any qualitative or quantitative analysis (*Id.*); (8) is so reliant on anecdotal evidence that the alleged 1%-2% difference in the structure with and without Helix, is unsubstantiated with any qualitative or quantitative analysis; (*Id.* at 4) and (9) is unreliable because the appraiser admits that he knows nothing about Helix and did nothing to study it (*Id.* at 4-5). Expert Report of Bernie Shaner, attached as Berg Decl. Ex. 23. Instead, plaintiffs' rebuttal expert concludes: "valuing Pensmore would be difficult for any appraiser." Expert Report of Alvarez & Marsal Disputes and Investigations, LLC at pg. 3, attached as Berg Decl. Ex. 24. David Paris also concludes that "defendants' experts analyses of economic waste are insufficient and unreliable." Rebuttal Expert Report of David Paris ¶ 14, attached as Berg Decl. Ex. 25. Mr. Paris criticizes defendants' experts for dedicating only one paragraph to economic waste in the expert report of Jeff Johnson and criticizes defendants' expert Ryan Clark for relying exclusively on defendants' appraisal. Rebuttal Expert Report of David Paris ¶ 14-15, attached as Berg Decl. Ex. 25.

41.     Plaintiff admits that the quoted language in City Wide's Statement of Uncontroverted Material Facts No. 41 is reflected in plaintiffs' Rule 26(a)(1) supplemental disclosures; however, plaintiffs' expert David Paris has submitted an initial expert report a supplemental expert report and a rebuttal expert report, which are the best evidence of the opinions he will offer in this matter. Plaintiffs admit that they will ask the jury for exemplary damages.

42.     Plaintiffs deny that Mr. Paris fails to offer an opinion "concerning the value of the concrete plaintiffs allege was delivered by City Wide compared to the value of the concrete plaintiffs allege it should have received," as asserted in City Wide's Statement of Uncontroverted Material Facts

No. 42. Mr. Paris was asked to assume that if the plaintiffs are not awarded the remedy of specific performance or fraud damages that he should calculate the cost to repair Pensmore, which he has done. Initial Expert Report of David Paris ¶16(c), attached as Berg Decl. Ex. 21.

43. Plaintiffs admit that among the various remedies quantified by David Paris, two of them include the cost to tear down Pensmore and rebuild it ($16.56MM to $18.98MM), the lost opportunity damages ($13.27 million to $21,809,233) as partially identified in City Wide's Statement of Uncontroverted Material Facts No. 43; however, defendants' statement is not a complete one. Defendants omit that: (1) various other measures of damages quantified by Mr. Paris, including damages for conversion and unjust enrichment if liability is established (Initial Expert Report of David Paris ¶39-48, attached as Berg Decl. Ex. 21); (2) other measures of damages identified by Mr. Paris but not quantified such as out of pocket expenses (which will be quantified by Mr. Huff) (Initial Expert Report of David Paris ¶49, attached as Berg Decl. Ex. 21); (3) defendants' appraiser, Bernie Shaner, relies on the approximately $16.56 million quantification of the costs to build Pensmore as part of his appraisal because the computation is "reliable" (Shaner Tr. at 107, attached as Berg Decl. Ex. 26); (4) defendants' expert, Jeff Johnson, applies Mr. Paris' lost opportunity methodology in his own analysis because it, too, is "reasonable" (Deposition Transcript of Jeff Johnson at 35-36, attached as Berg Decl. Ex. 27); (5) the law Mr. Paris was instructed to assume, including that the cost to rebuild Pensmore, is a remedy available under the theories of specific performance, fraud and the cost to repair Pensmore (May 19, 2016 letter from Gabriel Berg to David Paris, attached as Berg Decl. Ex. 28); and (6) Mr. Paris was instructed that plaintiff may be required to elect their remedies after trial (*Id.*).

44. Plaintiffs admit that Mr. Paris identifies that plaintiff's damages may include out-of-pocket expenses, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 44.

45.     Plaintiffs admit that Mr. Paris does not quantify plaintiffs' out-of-pocket expenses, as asserted in City Wide's Statement of Uncontroverted Material Facts No. 45.

46.     Plaintiffs admit that the quoted language in in City Wide's Statement of Uncontroverted Material Facts No. 46 is included in Mr. Paris' report; however, the statement is not a complete one. Defendants omit the entirety of what Mr. Paris was asked to assume. Initial Expert Report of David Paris ¶16, attached as Berg Decl. Ex. 21.

47.     Plaintiffs admit that Mr. Paris stated that plaintiffs incurred roughly $1.4 million in construction costs in 2015 and roughly $393,000 in construction costs in 2016 as of the date of his initial report, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 46.

48.     Plaintiffs admit that Mr. Harter testified that the funds used to construct Pensmore came from cash on hand and that the quotation included in City Wide's Statement of Uncontroverted Material Facts No. 48 reflects Mr. Harter's testimony.

49.     Plaintiffs admit that the only assets that Mr. Harter was aware of that is owned by Pensmore LLC are a Fidelity investments bank account, which largely contains cash with a minimal rate of return, included in City Wide's Statement of Uncontroverted Material Facts No. 49; but, deny that the statement is a complete one.  Mr. Harter testified that Pensmore LLC owns the property and was not asked whether Pensmore LLC owns the structure known as Pensmore.  Deposition Transcript of Alan Harter (hereafter "Harter Tr.") at 16, attached as Berg Decl. Ex. 29.

50.     Plaintiffs admit that Mr. Harter testified that Huff family LLC was not a direct participant in the investments reflected on the report summarizing the Huff family is alternative investments, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 50; but, deny that the statement is a complete one.  Mr. Harter testified that Huff Family LLC is or maybe an

"owner or manager" of all of the entities identified in the Huff Family Alternative Portfolio. Harter Tr. at 38, attached as Berg Decl. Ex. 29

51.     Plaintiffs deny that Mr. Paris opined that the Huff family would have invested the funds used to construct Pensmore in the Huff Family alternative investment portfolio, included in City Wide's Statement of Uncontroverted Material Facts No. 51. Rather, Mr. Paris relies on conversations with Mr. Harter to establish that the funds used to construct Pensmore would have been invested in the Huff Family alternative investment portfolio. Mr. Paris opines that based on the alternative investment portfolio's actual returns, measured from October 2009 to October 2016, the internal rate of return is 9.33% on all Huff Family alternative investments and 20.39% on all closed Huff Family alternative investments. Supplemental Expert Report of David N. Paris, attached as Berg Decl. Ex. 30. In addition, though mentioned nowhere in defendants' in City Wide's Statement of Uncontroverted Material Facts, after Mr. Paris' report issued, Mr. Harter testified the $16 million used to construct Pensmore would have been invested in the "same strategy," Huff family alternative investment portfolio, consisting of farms, apartments and loans, because, "quite frankly, having the access to that much more capital, we could've gone and more heavily in any number of assets in terms of the farms, the apartments and the loans." Harter Tr. at 129, attached as Berg Decl. Ex. 29.

52.     Plaintiffs admit that prior to founding Pactolus Wealth Management, Mr. Harter was limited in the investment options available to pursue for the Huff family because he was managing the Huff Family's money at Morgan Stanley, as articulated in City Wide's Statement of Uncontroverted Material Facts No. 52. Mr. Harter was required to make more conservative investments while managing the Huff Family's money at Morgan Stanley. Harter Tr. at 112-113, attached as Berg Decl. Ex. 29.

# III.   ARGUMENT

## A.   Whether the UCC Applies is a Question of Fact

City Wide's entire brief is premised on its assertion that the UCC is applicable to this case. Ignoring the documentary evidence and the numerous admissions made by City Wide employees and experts, defendants rely on general allegations to conclude that Pensmore's claims are "primarily for the sale of goods," to which the UCC's breach of warranty applies.  (Def. Br. at 15-16)  Yet, the only support City Wide cites for its assertion are three cases relegated to a footnote.  There is no meaningful analysis of these cases, and ultimately City Wide applies the UCC by fiat. (Def. Br. at 15, n.4).  In fact, Article 2 of the UCC applies to the sale of goods, not the exchange of services.  *See generally* Mo. Rev. Stat. §400.2-102 (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . "); *see also Mo. Farmers Ass'n v. McBee*, 787 S.W.2d 756, 760-61 (Mo. Ct. App. 1990) ("Provisions of the U.C.C. apply only to transactions in goods." In affirming lower court's holding that a contract for the sale of herbicide and the spraying of crops was a service contract, Court, and concludes that "implied warranties do not apply to service contracts") (internal citations omitted); *see also Jones v. Galaxy 1 Mktg., Inc.*, 478 S.W.3d 556, 571 (Mo. Ct. App. 2015) ("[If] the contract is a contract for services, the U.C.C. does not apply.").

In attempting to redefine the contract as one for the sale of goods, City Wide relies on the self-serving affidavit of David Calhoun, whose relationship to the Pensmore project lacks foundation; but, who claims that City Wide did not pour concrete for Pensmore, or even construct it.  A mountain of contrary evidence exists -- and Mr. Calhoun's affidavit is of no evidentiary value.  The Court "may discount a [party's] self-serving affidavit or deposition testimony as a matter of law where it clearly

contradicts … earlier testimony under oath" and where there is no explanation as to the inconsistency. *Stewart v Rise, Inc.*, 791 F.3d 849, 861 (8th Cir 2015).

The two City Wide witnesses most directly responsible for mixing Helix into the Pensmore cement, Mr. Shuler and Mr. Aubuschon, concede that they poured the concrete at Pensmore and constructed it. In addition, defendants' technical experts at the CTL Group undertook a study to determine whether clumping, balls or "clumps" of Helix that can form during a pour which are removed from the cement and discarded, might explain the Helix shortages in forty of fifty-two of the Pensmore core samples tested by CTL. In so doing, defendants' experts identified the skill involved in properly mixing Helix into the cement to minimize clumping. Specifically, CTL concludes that vibration techniques and spreading the Helix by hand over a metal screen results in minimizing the amount of clumps found in the Helix-mixed cement. Consistently, Mr. Aubuschon and Mr. Shuler testified that prior to the first pour City Wide had a screen built, as of the second pour City Wide used vibration techniques and always spread the Helix by hand. (Statement of Disputed Facts ("SDF") ¶ 7). In short, defendants provided services to plaintiffs.

Resolving any doubt about whether City Wide provided services to the plaintiffs is the testimony of defendants' own technical expert from CTL. Dr. Dennis McCann, who has a PhD in civil engineering, testified as follows:

> Q…Now, you understood that City Wide's role in this project was to mix the Helix into the concrete. Correct?
> **A. Yes.**
> Q. And that's a service they provided for Pensmore. Correct?
> **A. Correct.**
> Q. And you understand that the actual Helix product itself was purchased by the plaintiffs in the case. Right?
> **A. That's my understanding, yes.**
> Q. And stored at City Wide's facilities. Correct?
> **A. That's my understanding.**

(SDF ¶ 7). Dr. McCann's testimony is consistent with applicable Missouri law.

Many courts have held that agreements for the pouring and setting of concrete are predominantly agreements for services, to which the UCC is inapplicable. *See, e.g., ESPJ Const. Corp. v. Shiavone*, 2008 WL 2663703, at *5 (N.J. App. Div. 2008) ("Based upon our review of the record, we are satisfied the UCC does not govern the contract here because it was one for services, namely the pouring and setting of concrete, not goods. The concrete is not a 'moveable item for sale,' nor is there any evidence that either defendant or his customers intended to re-sell the concrete after its installation."); *see also Kyweriga v. Muenchow*, 1993 WL 355831, at *7 (Minn. Ct. App. 1993) (contract for floor installation where defendant "brought in gravel, compacted the ground, and poured and leveled the cement . . . was primarily for services"); *see also Freeman v. Shannon Constr., Inc.*, 560 S.W.2d 732, 737 (Tex. Ct. App. 1977) (affirming that contract for pouring cement "called for the furnishing of services including both labor and material; however, the essence of the transaction was for services rather than the sale and passage of title to goods.").

The Court need not resolve the UCC question on this motion. In fact, City Wide's motion must be denied because under Missouri law the question of whether the UCC applies is a question of fact. *See, e.g., Prince v. Spire Corp.*, 584 S.W.2d 108, 111 (Mo. Ct. App. 1979) ("We cannot say from the record before us that as a matter of law the essence of the oral contract in this case was not a service contract. That must be determined from a consideration of all material and relevant factors including the precise work to be done and the customs and usages in the industry. It is an issue of fact . . . ."). City Wide urges this Court to draw an improper inference in City Wide's favor, that the UCC is applicable. Yet, "[t]he Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence." *Multivac, Inc. v Rotella's Italian Bakery, Inc.*, 14-1003-CV-W-ODS, 2016 WL 1030150, at *3 (W.D.

24

Mo. Mar. 10, 2016) citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984). To the extent defendants rely on Ohio and Maryland law, courts in those jurisdictions also hold that the goods versus services determination is improper for resolution on a motion for summary judgment. *See, e.g., Harford Mut. Ins. Co. v. Seibels, Bruce and Co.*, 579 F.Supp. 135, 138 (D. Md. 1984) (denying summary judgment as to whether "computer software programs in question are goods or services for purposes of applying the UCC . . . because these issues depend upon material facts that are in dispute"); *see also RPC Elec., Inc. v. Wintronics, Inc.*, 2012 WL 986484, at *3 (Ohio Ct. App. 2012) ("[W[hether a transaction predominantly involves goods or services is ordinarily a question of fact for the jury").[1] Even if contracts involving the pouring and setting of concrete are viewed as "mixed" contracts, when the service aspect of an agreement predominates over the sale aspect, the UCC is inapplicable. Missouri Courts have held: "In determining whether the UCC applies to a mixed goods and services contract, the dominant element test is applied to determine the nature of a contract. The question is whether the contract's predominant purpose is the rendition of service, with goods incidentally involved, or is a transaction for sale, with services incidentally involved." *McBee*, 787 S.W.2d at 760 (internal citation omitted); *see also LeSueur Creamery, Inc. v. Haskon, Inc.*, 660 F.2d 342, 347 n. 6 (8th Cir. 1981) ("[T]he generally accepted rule that when a contract involves both the sale of goods and rendition of services, the test for whether the UCC's implied warranty and disclaimer provisions . . . are applicable is whether the goods or services aspect predominates.").

---

[1] Defendant's reliance on cases involving the delivery of concrete, as opposed to mixing Helix into poured concrete, are readily distinguishable and highlight the fact-intensive inquiry of whether a contract is primarily one for goods or services. *See Shelly Materials v. Great Lakes Crushing*, No. 2013-Ohio-5654, 2013 WL 6810660 (Ohio Ct. App. Dec. 23, 2013) (cited by defendant, stating that "in installing the new . . . sidewalk, [plaintiff] used concrete that was supplied by [defendant's subcontractor]"); *see also Maryland Supreme Corp. v. Blake Co.*, 369 A.2d 1017, 1023-24 (1977) (cited by defendant, with no indication that supplier did anything more than "furnish," "supply" and "deliver" ready-mix concrete).

25

**B.      Plaintiffs' Claims are Timely and Huff Family LLC has Standing**

City Wide's arguments that plaintiffs' contract claims are barred by the statute of limitations and that Huff family LLC has no standing fail as a matter of law because they ignore that under Missouri law: (1) plaintiffs' claims did not accrue until October 2014 (at the latest) because the discovery rule applies; (2) Pensmore LLC's claims relate back to the first date of filing of this action because defendants admitted that there was no prejudice to them when they consented to adding Pensmore, LLC as a plaintiff; (3) Steven T. Huff Family, LLC is the party that suffered the harm because it paid to construct Pensmore; and (4) Pensmore LLC is not separate from the Steven T. Huff Family LLC.

First, plaintiffs' breach of contract claim is subject to a five-year statute of limitations, Mo. Rev. Stat. § 516.120, because the UCC does not apply.   In addition, under the discovery rule, plaintiffs' claims do not accrue until the date of discovery.  *See Business Men's Assur. Co. of America v. Graham*, 984 S.W.2d 501, 507 (Mo. 1999) ("The triggering event of the applicable statute of limitations is when damage is sustained and becomes capable of ascertainment.") (internal citations and quotation marks omitted).   Missouri courts have interpreted the "capable of ascertainment" standard to mean, "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages.  In order for the statute of limitations to accrue, plaintiff must have knowledge of the wrong and at least nominal damage, or knowledge of something that puts plaintiff on notice to inquire further." *Stolzenburg v. Biewer Lumber, LLC*, 2016 WL 3582032, at *4 (E.D. Mo. 2016) (internal citations and quotation marks omitted) (holding "that an issue of fact exists regarding whether Plaintiff was prevented from ascertaining the damage to his decking based upon the representations by Defendants").   Further, in the context of construction projects such as Pensmore's, to "follow

[defendant's] theory would place upon an aggrieved party the task of piecemeal litigation…Neither §§ 516.100 nor 516.120 contemplate or even permit such a suggestion." *Linn Reorganized School Dist. No. 2 of Osage Cnty. v. Butler Mfg. Co.,* 672 S.W.2d 340, 342-44 (Mo. 1984) (holding that the statute of limitations in "an ongoing construction project involv[ing] contractual damages" does not begin to run until "all resulting damage could be recovered, and a full and complete recovery, if warranted, could be obtained" in part to account for the possible correction of any defects by the vendor throughout the life of the project).

It is undisputed that Steven Huff first learned about the Helix shorting scam when James Aubuschon revealed it to him in October 2014. Mr. Huff confirmed the allegations through core tests taken from Pensmore in April 2015. This action was filed on May 23, 2015 and is therefore timely.

Second, even if this Court were to find that the UCC applies, plaintiffs' claims are not time-barred because the discovery rule applies to UCC claims. *See, e.g., R.W. Murray Co. v. Shatterproof Glass Corp.*, 758 F.2d 266, 274 (8th Cir. 1985) (affirming holding that rejected statute of limitations defense under the UCC when "discovery of a relatively few defective panels did not require a finding that plaintiffs should have discovered the extensive nature of the panel failures prior to [the limitations period]. The evidence indicated that it was not alarming to discover a small percentage of panels with seal failures. Further . . . one of the means of discovering defective panels . . . was costly and unreliable . . . .").

Third, the parties' contractual relationship did not end until the Helix shorting scam was confirmed in 2015 and City Wide was terminated from the Pensmore project. Even using the date of City Wide's last Helix-mixed concrete pour, November 2012, all of plaintiffs' claims are timely. The contractual relationship is characterized by the ongoing nature of the construction; therefore, the statute

of limitations begins to run only when any resulting damages are fully "capable of ascertainment," and "the time allowed for corrections has passed." *See Linn*, 672 S.W.2d at 342.

Fourth, to satisfy the Article III standing requirement, the plaintiff must show (1) that he or she "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical;" (2) that there was a "causal connection between the injury and the conduct complained of;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A demonstration of a personal stake is made by the plaintiff's showing that he "has sustained or is immediately in danger of sustaining some direct injury" and that his injury or threat of injury is "real and immediate," not "conjectural" or "hypothetical." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). A financial injury creates standing. *See, e.g., Clinton v. New York,* 524 U.S. 417, 432 (1998). Here, it is undisputed that the Steven T. Huff Family, LLC paid to construct Pensmore with funds loaned to it by Steven Huff. (SDF ¶ 2). In fact, defendants' own experts rely on this undisputed fact. Any financial impact felt by defendants' breaches, harms the Steven T. Huff Family LLC, the ultimate owner of Pensmore and the party that paid to construct it.

Defendant's argument that the HF lacks standing in unsupported by the very cases it cites. The language relied on in defendant's lead case stands solely for the proposition that corporations are "distinct legal entities." *Allstate Indem. Co. v Rice*, 2013 WL 1314195, at *2 (W.D. Mo. Mar. 28, 2013). It holds nothing more. Defendant's second case involves an individual's standing to challenge a civil forfeiture. *United States v Eleven Million Seventy–One Thousand One Hundred and Eighty–Eight Dollars and Sixty–Four Cents ($11,071,188.64) in United States Currency*, 825 F.3d 365, 371 (8th Cir 2016). The standard to establish standing in a civil forfeiture case is specific to the law of

civil forfeiture and not applicable here. Yet, even if the Court were to adopt the civil forfeiture standard, HF would satisfy it: "to establish Article III standing to challenge a civil forfeiture complaint, a claimant must show 'a sufficient ownership interest in the property to create a case or controversy capable of federal judicial resolution. Ownership interest can be shown by actual possession, control, title, and financial stake.'" *Id*. at 371.[2] Defendant has not met its burden to show that HF must be dismissed. Last, on this record, defendants cannot even establish that the HF is separate from Pensmore, LLC, as Mr. Huff testified that Pensmore, LLC has no employees, business plans, income statements, annual reports or cash flow statements. (SOF 2). They are "disregarded" entities for tax purposes and are dominated and controlled by Steven Huff. (SOF 2).

Fifth, even if HF had no standing to bring its contractual claims, the five-year statute of limitations is applicable to Pensmore LLC's contract claim, which relates back to the date of HF's filing of the breach of contract claim, May 23, 2015. *See Rotella v. Joseph*, 615 S.W.2d 616, 624 n. 8 (Mo. App. 1981) ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action against him, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a limitation defense. This seems particularly sound inasmuch as the courts will require the scope of the amended pleading to stay within the ambit of the conduct, transaction, or occurrence set forth in the original pleading.") citing 6 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 1501, at 523. Pensmore, LLC was properly added as a plaintiff on a motion that defendants did not oppose because they could show no prejudice. Defendants still can demonstrate no prejudice.

---

[2] Defendant's remaining cases include a non-binding, distinguishable holding of the Kentucky state court's application of Kentucky's Title XXII Private Corporations and Associations law; and a Southern District of New York case in which a party unequivocally assigned its right to sue to another entity.

29

**C.      The Economic Loss Doctrine Does Not Bar Pensmore's Fraud Claim**

City Wide argues that it is entitled to summary judgment on Pensmore's fraud claim because, they claim, it is "substantially redundant" of the contract claim, which it re-characterizes as a UCC breach of warranty claim.  City Wide's argument fails because it denies that plaintiffs have any claim for breach of contract or warranty.  Having staked out the position that the contract claim is not viable (even as a UCC claim), it cannot claim that plaintiffs' contract claim is duplicative.  In addition, defendant failed to move this Court to dismiss the fraud claim on these grounds at the pleading stages, and now offers no undisputed facts that would require this Court to revisit its prior order sustaining Pensmore's fraud claim.  Each case that City Wide relies on raises the economic loss rule in the context of a motion to dismiss.[3]

City Wide also misstates the law and misapprehends Pensmore's allegations.  "There are two critical factors in examining whether a fraud claim is independent of a contract claim under the economic loss doctrine.  The first is whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract.  The second factor looks to whether the plaintiff suffered additional damages outside the contract because of the alleged fraud."  *Web Innovations & Technology Svcs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F.Supp.3d 928, 933 (E.D. Mo. 2014) (internal citations omitted).  Therefore, a "fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement."  *AKA Distributing Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998).

---

[3] Defendant's attempt to strike Pensmore's fraud claim is unsupported by its cited authorities, each of which analyzes whether the plaintiff has adequately pled the economic loss doctrine in the context of a motion to dismiss or amend the pleadings.  *See Nestlé Purina Petcare Company v. Blue Buffalo Company Ltd.*, 181 F.Supp.3d 618 (E.D. Mo. 2016) (cited by defendant, granting in part motion to dismiss); *see also Trademark Medical, LLC v. Birchwood Laboratories, Inc.*, 22 F.Supp.3d 998 (E.D. Mo. 2014) (cited by defendant, denying motion to amend the pleadings).

30

Defendant deliberately conflates the facts in order to treat them as identical. The difference between tort and contract claims, intentional versus unintentional conduct, compels that both claims be submitted to the jury. Plaintiffs can show a breach of contract if, for example, there was no intentional shorting scheme. If the jury believes that clumping was the cause of the Helix shortage in the core samples at Pensmore, it can find the clumping issue to be defendants' responsibility and hold them liable. In fact, James Aubuschon testified that City Wide was worried about losing the Pensmore contract because of the possible clumps of Helix. (SDF ¶ 5). Don Shuler confirms this fact. *Id.* Similarly, defendants may be held liable for breach of contract if there is a determination made that the boxes of Helix were not mixed into the concrete in the amount the plaintiffs bargained for, even if there was no intentional shorting scheme. Again, forty out of fifty-two of defendants' Pensmore core samples are below the expected dosages. (SDF ¶ 3). This fact supports a breach of contract claim, whether defendants' conduct was intentional or unintentional. Separately, if plaintiffs prove that the Helix shortages were caused by intentionally shorting boxes of Helix, some of which were used in Debra Roe's home, or if the jury does not believe Don Shuler's denial that the intentional shorting scheme occurred, a fraud claim is established. (SDF ¶ 3). The distinction between tort and contract claims requires proof of intentional and unintentional conduct. Here, those facts are quite distinct.

More to the point, in construction cases both fraud claims and contract claims are submitted to a jury, especially where defendants deny the validity of either claim. In *Davis v. Clear Building Corp.*, a remarkably similar case to this one, the parties contracted for the construction of a horse barn with beams that defendant fraudulently claimed were stronger than those used by competitors. Following a jury trial in which the remedy awarded was to tear down the barn and rebuild it, the appellate court held:

a claim for breach of contract and a claim for fraudulent misrepresentation are not inconsistent legal theories. . . . A party who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively.

143 S.W.3d 659, 669 (Mo. Ct. App. 2004) (internal citations and quotation marks omitted) (holding that plaintiffs were "entitled to pursue all of their claims," including claims for breach of contract and fraud).

Last, the economic loss doctrine does not apply to claims for fraudulent inducement. "A party who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively. They may be joined in one pleading and submitted for verdicts in the same action." *Kincaid Enterprises, Inc., v. Porter*, 812 S.W.2d 892, 900-901 (Mo.App. W.D. 1991) ("It is well to understand that a claim for breach of contract and a claim for fraudulent inducement to make that contract are not inconsistent remedies."). In fact, the obligation "not to fraudulently or negligently assert factual misrepresentations to induce another party to form a contract is a duty that exists independently of any contractual obligations ultimately formed." *See Elkhart Metal Fabricating, Inc. v. Martin*, No. 14-CV-00705, 2014 WL 2972709, at *2 (E.D. Mo. July 1, 2014). It is undisputed that prior to the first pour at Pensmore, defendants assured plaintiffs that they could mix the Helix into the cement in the proper dosages. (SDF ¶ 3, 5). This assurance was made to induce Pensmore to pay City Wide to pour the Helix-mixed concrete. The economic loss doctrine does not preclude Pensmore's fraud in the inducement claim.

**D.     Defendants' Damages Arguments are Improperly Raised on Summary Judgment**

City Wide does not argue that plaintiffs have no damages. Instead, City Wide improperly seeks to narrow plaintiffs' damages, ignoring that Pensmore's uniqueness governs the remedy available to plaintiffs. City Wide prematurely tries its damages case on the pages of its summary judgment motion.

City Wide urges this Court to adopt its theory of damages on summary judgment, without hearing the evidence that the cases they cite require at trial. Yet, each case cited by defendants in the damages portion of their brief involves a bench or jury trial, except *Kruger v. Subaru of Am., Inc.*, 996 F. Supp. 451, 455 (E.D. Pa. 1998), in which a UCC claim was pled after plaintiff prevailed on other claims in arbitration.[4] On this basis, alone, City Wide's motion should be denied. Plaintiffs are entitled numerous categories of damages, none of which are appropriately limited here.

### 1. Pensmore is Unique

Every witness in this case, including all seven of defendants' experts, agrees one undeniable fact: Pensmore is a unique structure. Yet, in analyzing the remedies available to the plaintiffs, City Wide completely ignores Pensmore's uniqueness.[5] (SDF ¶ 40). Specific performance is warranted where the structure is unique and there is no adequate remedy at law, for example, where the steel at issue is custom-ordered or fabricated to specifications. *In re Havens Steel Co.*, 317 B.R. 75, 87 (Bankr. W.D.

---

[4] *Foam-Tex Ind., Inc. v. Relaxaway Corp.*, 358 F. Supp. 8, 14 (E.D. Mo. 1973) (bench trial); *Kelley v.Widener Concrete Const.*, 401 S.W.3d 531 (Mo. Ct. App. 2013) (bench trial); *Wisch & Vaughan Const. Co. v. Melrose Props. Corp.*, 21 S.W.3d 36, 42 (Mo. Ct. App. 2000) (jury trial); *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 527 (Mo. Ct. App. 1998) (bench trial); *Bus. Men's Assur. Co. of Am. v. Graham*, 891 S.W.2d 438, 449 (Mo. Ct. App. 1994) (jury trial); *White River Dev. Co. v. Meco Sys.*, 806 S.W.2d 735 (Mo. Ct. App. 1991) (bench trial); *Lerner v. Yeghishian*, 271 S.W.2d 588 (Mo. Ct. App. 1954) (jury trial); *Miller v. Stan Ortmeier Const. Co.*, 426 N.W.2d 272 (Neb. 1988) (jury trial); *Kruger v. Subaru of Am., Inc.*, 996 F. Supp. 451 (E.D. Pa. 1998) (summary judgment following arbitration).

[5] None of the UCC cases on which City Wide relies involves unique goods. City Wide's cases are all easily distinguishable. *See Foam-Tex Indus., Inc. v. Relaxaway Corp.*, 358 F. Supp. 8 (E.D. Mo. 1973) (case was tried and opinion dealt only with defendant's counterclaim after directed verdict for plaintiff. Defendant knew of non-conformance of goods but did not revoke acceptance, defendant not entitled to damages because failure rate of plastic and cloth bindings on cot covers were the same); *Lerner v. Yeghishian*, 271 S.W.2d 588 (Mo. Ct. App. 1954) (post-trial appeal on allegedly erroneous jury instruction; standard breach of warranty damage calculation not used because of use of carpet by plaintiffs for three years previous to cleaning); *Miller v. Stan Ortmeier Const. Co.*, 426 N.W.2d 272 (Neb. 1988) (appeal of jury finding for plaintiff; defendant's conduct was proximate cause of plaintiff's injury but jury award was excessive where it gave plaintiff substantially more than his trial testimony of the difference in value, plaintiff entitled to difference in value only where it failed to put forward sufficient evidence during trial of other measure of damages. Difference in value established by plaintiff's estimation alone); *Kruger v. Subaru of Am., Inc.*, 996 F. Supp. 451, 457 (E.D. Pa. 1998) (no contest of application of breach of warranty to case because plaintiffs were the ones who affirmatively brought claims under breach of warranty for car; plain language of express warranty precluded damages).

Mo. 2004) (specific performance is granted at discretion of the court). Even if the UCC were applicable, specific performance is also an available remedy to plaintiffs. The UCC recognizes different protections for unique goods. UCC § 2-716, codified in Missouri as Mo. Ann. Stat. § 400.2-716, provides that a buyer of unique goods has the remedies of specific performance, and may include relief in whatever form the court finds appropriate.[6]

### 2. Plaintiffs are Entitled to Cost To Rebuild Pensmore Damages for Fraud

Even if this Court does not order specific performance, plaintiffs are entitled to ask the jury to award fraud damages in the amount of money that it would cost to tear down Pensmore and rebuild it properly, even if Pensmore is not actually torn down and rebuilt. Again, *Davis v. Cleary Building Corp.*, 143 S.W.3d 659, is directly on point. In *Davis*, the plaintiffs wanted to build a horse barn using beams that exceed the usual strength requirements. *Id*. at 663. Cleary Building represented that their construction columns were stronger than ones used by its competitors. *Id*. Plaintiffs also specified where columns should be placed, which differed from defendant's standard placement. *Id*. After the barn was built, plaintiff discovered only four out of twenty-four were stronger columns. *Id*. at 664. Even though the beams conformed to applicable industry standard, the Court of Appeals found that defendant's deviations were not trivial and were so significant that the barn would essentially need to be rebuilt in order for plaintiffs to get the benefit of their bargain in fraud or contract. *Id*. at 666.

### 3. The Cost to Repair Pensmore

In the event that plaintiffs do not prevail on their first two theories of recovery, they will ask for damages in the amount of the cost to repair Pensmore. As the walls of Pensmore are hardened and the Helix is under-dosed throughout the structure, the only way to repair the structure is to the pay cost to

---

[6] § 2-716. Buyer's Right to Specific Performance or Replevin., Unif.Commercial Code § 2-716 ("(1) Specific performance may be decreed where the goods are unique or in other proper circumstances. (2) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just."); Mo. Ann. Stat. § 400.2-716 (West).

tear down the structure and rebuild it. In Missouri, two tests have been applied to calculate damages in cases involving defective performance of a building contract: the cost-to-repair method and the diminished-value method. *Rogers v. Superior Metal, Inc.,* 480 S.W.3d 480, 482-83 (Mo. Ct. App. 2016) (internal citations omitted). In defective construction cases, the "cost of repair" test is favored as the correct measure of damages, "so that courts normally determine the damages by assessing the cost of correcting the defects or supplying the omissions." *Bus. Men's Assur. Co.*, 891 S.W.2d at 450. The diminished value method is only used as an exception where the cost of reconstruction and completion in accordance with the contract would involve unreasonable economic waste.[7] *Id.* If various parts of a construction are defective ("separate defects"), courts can also apply the cost rule to some aspects and diminished value to others. *Kelley v. Widener Concrete Const., LLC,* 401 S.W.3d 531 (Mo. Ct. App. 2013).

The choice between these methods is determined by the shifting burden of proof and are particular to the facts of each case. "'Once the landowner presents evidence on the cost of repair or replacement, the contractor has the burden of presenting evidence that the cost of repairing or replacing the property is disproportionate to the diminution in value of the property.'" *Rogers v. Superior Metal, Inc.*, 480 S.W.3d 480, 483 (Mo. Ct. App. 2016). *See also Bus. Men's Assur. Co.*, 891 S.W.2d at 450 ("The contractor has the burden of proving that repairing the defect would result in unreasonable economic waste."); *Stom v. St. Clair Corp.,* 153 S.W.3d 360, 365 (Mo. Ct. App. 2005) (trial court erred

---

[7] Defendants bear the burden of establishing economic waste, and the burden is a heavy one. In the cases cited by defendants involving a discussion of economic waste, only one found economic waste and it do so only partially. In *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 527 (Mo. Ct. App. 1998), the appellate Court affirmed a lower Court's ruling that a Court that ordered a construction company to replace a roof, as not constituting economic waste. In *White River Dev. Co. v. Meco Sys.,* 806 S.W.2d 735 (Mo. Ct. App. 1991), the Court found no economic where the cost to repair was appropriate and diminution in value as to certain other defects.

in applying the law by improperly placing the burden of production of evidence as to diminished value on plaintiffs after they produced evidence of cost of repair or replacement).

53.     Defendants assert that economic waste is established by the appraisal submitted in this case.  Yet, plaintiffs have served a rebuttal expert report, which renders defendants' appraisal unreliable and not credible.  The rebuttal report establishes that defendants' appraiser:  (1) admits that there are no comparable sales of properties to apply to Pensmore because it is so unique, yet he ultimately applies a residential sale comparable to Pensmore; (2) questioned the validity of his own appraisal; (3) failed to apply the correct methodology, ignoring that he was required to perform a contribution analysis (which determines the value of individual components of a structure) ,in his diminution in value opinion, and instead speculates about a prospective residential buyer's level of interest in Helix; (4) failed to define a proper market for Pensmore, limiting the defined market to Missouri, ignoring that given "the unique nature of this asset a national marketing campaign, or beyond, would likely be implemented in an attempt to sell this asset;" (5) is so subjective that he fails to substantiate a 60% reduction in the value of Pensmore with any qualitative or quantitative analysis; (6) is so reliant on anecdotal evidence that the alleged 1%-2% difference in the structure with and without Helix is unsubstantiated with any qualitative or quantitative analysis; and (7) is unreliable because the appraiser admits that he knows nothing about Helix and did nothing to study it.  (SDF ¶ 40).  In his Rebuttal Expert Report, David Paris concludes that "defendants' experts' analyses of economic waste are insufficient and unreliable."  (SDF ¶ 40).  Mr. Paris further criticizes defendants' experts for dedicating only one paragraph to economic waste in the expert report of Jeff Johnson and criticizes defendants' expert Ryan Clark for relying exclusively on defendants' appraisal.  (SDF ¶ 40).

The question of whether economic waste exists is usually one for the jury based on the facts of the case.  *See Rust & Martin, Inc. v. Ashby*, 671 S.W.2d 4, 8 (Mo. Ct. App. 1984) (whether

unreasonable economic waste would occur if owners had defectively installed floor replaced with new floor was question for jury). As plaintiffs' rebuttal expert concludes: "valuing Pensmore would be difficult for any appraiser." (SDF ¶ 40). Defendants' own appraisal values Pensmore to be worth so little that the appraisal itself is the best evidence that defendants cannot meet their burden. For present purposes, in determining the measure of damages from defective performance, "[a]ny reasonable doubt whether curing defects would cause economic waste should be resolved against the [party] guilty of the breach." *Rust & Martin, Inc*, 671 S.W.2d at 8. Summary judgment is improper on this robust record.

Separately, defendants also deliberately cite to incomplete testimony in order to create false impressions about Mr. Huff's testimony. The complete answers, raising numerous questions of fact, include: (1) Pensmore was built to serve as a living laboratory to promote the study of science in this country, to be a durable and green structure to serve as a showcase to launch the businesses of TF Forming Systems and Polytorx.[8] (SDF ¶ 15). (2) While Pensmore is "stronger than most structures," Mr. Huff testified, "but it's not as strong as it should have been or would have been." (SDF ¶ 16). (3) While Pensmore meets code and is stronger than a wood frame structure, Steven Huff testified that adding Helix was required to achieve design loads, not to meet code, because Mr. Huff was never concerned about meeting code. (SDF ¶ 16). Mr. Huff was much more specific than defendants acknowledge about the "design loads" and "wind loads" that he sought to achieve in constructing Pensmore. Mr. Huff testiftied that he was designing "towards 300 miles an hour" because that is the

---

[8] Even if Pensmore were only constructed as a residence, plaintiffs would be entitled to its full measure of benefit of the bargain damages. *See Rust & Martin, Inc. v. Ashby*, 671 S.W.2d 4, 7 (Mo. Ct. App. 1984) ("[T]here is authority that the damages for breach of contract in constructing a dwelling, not built in accordance with the plans and specifications, are the costs required to reconstruct it to make it conform to such plans, since, unlike a commercial structure, a dwelling has aesthetic value and must be constructed as the owner wants it, even though the finished dwelling may be just as good.").

highest velocity winds ever recorded. (SDF ¶ 19). Plus, Mr. Huff "wanted to design a structure that was … able to withstand any kind of debris impact that nature could throw at it with a lot of safety margins and so that's – that was what led me to this design." (SDF ¶ 20). (4) While Mr. Huff testified, in part that he could live in Pensmore if it were finished, defendants omit that Mr. Huff's testimony about his concern that the roof would be torn off by an EF-5 tornado while living at Pensmore.[9] (SDF ¶ 19). (5) Defendant ignores Mr. Huff's testimony about his reluctance to "do any real testing on the structure." Mr. Huff further testified that he had planned to hurl projectiles, including large timbers and railroad ties at high velocities at Pensmore but that he canceled the test because he is not confident that the structure can withstand those tests. (SDF ¶ 37). As Mr. Huff said, "anything that was going to stress the structure, I would be reluctant to do." (SDF ¶ 37). (6) While some work has continued on Pensmore, it has been conducted in mitigation of damages, the majority of which revolves around the HVAC system implemented to prevent tax credits from lapsing. (SDF ¶ 38). (7) Defendants ignore other uses to which Pensmore was intended that it can never be used for, especially the marketing of Helix/Polytorx and TF Forming systems. (SDF ¶ 36).

### 4. Plaintiffs Can Recover Lost Opportunity Damages

Pensmore's breach of contract claim (and also its hypothetical UCC claim) which entitles it to recover "the benefit of [its] bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement," would include its recovery of "lost opportunity" damages. *Williams Const., Inc. v. Wehr*

---

[9] It is irrelevant whether Pensmore is inhabitable and safer than some other structures that exist – it is not built as it was supposed to be and for all the purposes it was supposed to be. *See Cty. Asphalt Paving Co. v. 1861 Grp., Ltd.,* 908 S.W.2d 184, 186 (Mo. Ct. App. 1995) ("Based upon the evidence before it, the trial court correctly used the cost rule to measure damages. In addition, the continued use of the defective parking lot was immaterial on the issue of the measure of damages. Usability of the parking lot did not mean that the contract to excavate and pave the parking lot was not breached and that contractor was not liable for damages therefor. To hold otherwise would lead to the anomalous result that there would be no breach of contract if contractor were to surface the parking lot with gravel so that it was usable.

*Const., L.L.C.*, 403 S.W.3d 660, 666 (Mo. Ct. App. 2012) (internal citations and quotation marks omitted). Defendant's unilateral assertion that "undisputed evidence" establishes that Pensmore would not have invested the funds used for the construction of Pensmore is belied by testimony of Mr. Huff's financial advisor, Alan Harter. Mr. Harter testified that the roughly $16 million used to construct Pensmore would have been invested in the "same strategy," Huff family alternative investment portfolio, consisting of farms, apartments and loans, because, "quite frankly, having the access to that much more capital, we could've gone and more heavily in any number of assets in terms of the farms, the apartments and the loans." (SDF ¶ 51). This single answer has been ignored by defendants.

To prove its entitlement to such consequential, lost profit/opportunity damages, Pensmore need only produce "evidence that provides an adequate basis for estimating the lost profits with reasonable certainty." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 54 (Mo. 2005). A business owner's "testimonial evidence [is] sufficient to provide the trier of fact with a rational basis for estimating damages to the plaintiff, including lost profits." *Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.,* 817 S.W.2d 530, 534 (Mo. Ct. App.1991) (citation omitted); *see, e.g., Parshall v. Buetzer,* 195 S.W.3d 515, 523 (Mo. Ct. App. 2006) (business owner's testimony that "based on his many years' experience in the concrete business, he would have earned fifteen per cent profit on that job ... established the fact of lost profits with reasonable certainty, and was sufficient to support the amount"). Here, there is nothing speculative about plaintiffs' theory. Mr. Paris uses an actual internal rate of return achieved on Mr. Huff's funds over the course of 2008-2016 and applies it to the money used to build Pensmore improperly that would have been invested. (SDF ¶ 51).

Last, defendant improperly resolves a fact question, whether the UCC applies, in its favor in order to unfairly attempt to minimize plaintiffs' fraud damages. Pensmore's fraud theory would likewise entitle it to a recovery of its consequential and lost opportunity damages. *See Davis*, 143

S.W.3d at 667 n. 4 ("[I]n a claim of fraud when pursuing actual damages, consequential damages are available.") citing *Hanes v. Twin Gable Farm, Inc.,* 714 S.W.2d 667, 670–71 (Mo. Ct. App. 1986) ("The requirement for proof of loss of profits is not absolute certainty, but only a sufficient factual basis such that the estimate of the loss is not based upon speculation or conjecture.")).

## IV. CONCLUSION

For all the reasons stated above, defendant City Wide's motion for summary judgment should be denied in its entirety.

Dated: March 15, 2017

Respectfully submitted,

*/s/ Gabriel Berg*
Bryan O. Wade, #41939 (MO)
Ginger K. Gooch, #50302 (MO)
HUSCH BLACKWELL LLP
901 E. St. Louis Street, Suite 1800
Springfield, Missouri 65806
Telephone: (417) 268-4000
Facsimile: (417) 268-4040
Bryan.wade@huschblackwell.com
Ginger.gooch@huschblackwell.com

Gabriel Berg NY Fed. Bar #: 4148
Lana Milojevic (NY #5080866)
*Pro Hac Vice*
KENNEDY BERG LLP
401 Broadway – Suite 1900
New York, NY 10013
Telephone: (212) 899-3400
gberg@kennedyberg.com

*Attorneys for Plaintiffs Steven T. Huff*
*Family, LLC and Pensmore, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 15th day of March, 2017, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Western District of Missouri, with notice of same being electronically served by the Court, addressed to:

Angela G. Nichols
Stinson Leonard Street LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
T: (816) 842-8600
F: (816) 691-3495
angela.nichols@stinsonleonard.com
***Attorneys for Defendants***

Respectfully submitted,

*/s/ Gabriel Berg*
Bryan O. Wade, #41939 (MO)
Ginger K. Gooch, #50302 (MO)
HUSCH BLACKWELL LLP
901 E. St. Louis Street, Suite 1800
Springfield, Missouri 65806
Telephone: (417) 268-4000
Facsimile: (417) 268-4040
Bryan.wade@huschblackwell.com
Ginger.gooch@huschblackwell.com

Gabriel Berg NY Fed. Bar #: 4148
Lana Milojevic (NY #5080866)
*Pro Hac Vice*
KENNEDY BERG LLP
401 Broadway – Suite 1900
New York, NY 10013
Telephone: (212) 899-3400
gberg@kennedyberg.com

***Attorneys for Plaintiffs Steven T. Huff Family, LLC and Pensmore, LLC***